SMITH *et al.*, Appellants, *vs.* THE CITY OF ST. LOUIS, Respondent.

1. Where the confirmee of a Spanish concession accepts a survey calling for a *street* along the bank of the Mississippi river, in an incorporated town, as a boundary, he will not be entitled, as a riparian owner, to land subsequently formed by accretion, although his concession may have called for the river as a boundary.

*Appeal from St. Louis Court of Common Pleas.*

This was an action for the possession of a piece of land lying on the Mississippi river, east of block 42, in the city of St. Louis. Block 42 is bounded north by Cedar street, east by Main street, south by Mulberry street, and west by Second street, and was confirmed to Auguste Chouteau under Devolsey. Chouteau's title was afterwards acquired by the plaintiffs, who claim the land sued for as an accretion made by the deposits of the river.

The original concession to Devolsey by St. Ange, acting commandant, dated August 15, 1766, described the land granted as " 240 feet in breadth on the side of or towards the (au coté du) Mississippi river, and fronting towards it ( et y faisant face,) by 300 feet in depth on the side of or towards the (au coté du) woods, the said front being on a great street, and the rear being on another great street ; bounded on one side by

another great cross street coming from the Mississippi, which runs by the land of Blondeau and Furcy, and on the north by another cross street coming from the Mississippi river."

The claim of Chouteau under this concession was presented to the old board of commissioners for confirmation, and on the 13th of December, 1811, they issued to him a certificate of confirmation for 240 by 300 feet, and ordered the same to be surveyed, but no survey was ever executed. In 1825, Chouteau proved up his claim before Recorder Hunt, under the provisions of the act of May 26, 1824, and received a certificate of confirmation, describing the land confirmed as " bounded on the east by Front street or the Mississippi, leaving a road between it and the lot." A survey of this last confirmation was executed in 1835, bounding it east by Main street, south by Cedar street, north by Mulberry street, and west by Second street. There was no call for the river. This survey was not approved until 1850.

The plaintiffs offered in evidence a survey of a confirmation to Thomas Rogers, which showed that, at that date, the Mississippi river and Main street came to a point at Cedar street, the north boundary of block 42.

It was admitted that all the land east of block 42 had been formed by accretion since 1840. A portion of the land thus formed was in 1845 surveyed, designated and set apart for the support of schools within the city of St. Louis, under the 2d section of the act of congress of May 26, 1824. The land sued for in this action was between the school survey and the river.

Upon an agreed case, showing the above facts, the plaintiffs were nonsuited, and appealed to this court.

*C. C. Whittelsey*, for appellants. 1. The plaintiffs had a river front, and are always entitled to such front under and by virtue of the confirmation, as proved before Recorder Hunt, which was for a lot " bounded on the east by Front street or the Mississippi, leaving a road between it and the lot." By the case agreed, all the land east of the line of the block is an

accretion made since 1840, so that, at that date, there was no street there except by going over the block, and the call is not for Main street, but Front street, an entirely different street. The main object called for is the river, and the tow or road left was the mere servitude imposed by the Spanish law upon all lands lying on navigable waters. ( *O'Fallon* v. *Price*, 4 Mo. Rep. 343. 3 Kent's Comm. 427, and notes, (7th ed.) *Morgan* v. *Livingston*, 6 Martin (La.) Rep. 19.) 2. The terms of the *grant* to Devolsey, made in 1766, gave him a riparian right, and that passed to Chouteau, and was confirmed to him. The words " face au fleuve," " face," " frente al rio," " *frente*," " front to the river," exclusively designate estates bounded by the river. ( *Morgan* v. *Livingston*, 6 Mart. (La.) Rep. 19. 3 Kent, 427. *King* v. *King*, 7 Mass. 496. *Lunt* v. *Holland*, 14 Mass. 149. 6 Cow. Rep. 544. 5 Wend. 423. 3 Ohio, 495. 5 Harr. & J. 195.) 3. As shore owners, plaintiffs are entitled to the alluvion, which has all formed since 1840. ( *New Orleans* v. *United States*, 10 Peters, 662. 1 Gill & J. 249. 5 Wheaton, 380. 4 Smedes & Marsh. 366. Code Civile, 556, 557, 561. 8 Pothier, 179, 157. 1 Mor. & Carlt. Part. 346, l. 26, tit. 28, p. 3. *Morgan* v. *Reading*, 3 Smedes & Marsh. 366. *Thomas* v. *Hatch*, 3 Sumner, 170. *Shelton* v. *Maupin*, 16 Mo. Rep. 124. 3 Scamm. 510.) 4. The reservation of the road does not prevent the alluvion from passing. ( *Morgan* v. *Livingston*, 6 Mart. (La.) Rep. 19. *Hogan* v. *Campbell*, 8 Porter's Ala. Rep. 9.) 5. The school survey between the lot sued for and block 42 cannot affect the question, as this land has been made since 1840, and was not a lot or land prior to 1812. 6. Under the Spanish government, St. Louis was not a city and had no city property, ( *New Orleans* v. *United States*, 10 Peters, 662. *Morgan* v. *Livingston*, 6 Mart. Rep. 470,) and the city can claim no title.

*T. T. Gantt*, for respondent. 1. By the title papers of the plaintiffs, it appears that the land confirmed to Chouteau had an eastern terminus different from the Mississippi, to-wit:

" the great or principal street" of the town of St. Louis. 2. According to the evidence of the possession of Chouteau, a strip of land, (no matter how narrow,) interposed between it and the river. This would prevent the accrual of any rights as riparian proprietors. 3. Both the original Spanish grant and the United States survey, made in 1835, bounded the confirmation or claim on all sides by streets. The claim of plaintiffs now is to go beyond and to the east of Main street, the eastern boundary of the confirmation and the survey. 4. It is believed that the admission that all the land east of block 42 (including Main street) has been formed since 1840, is broader than the facts will warrant. But it is clear, from the survey made in 1835, that there was a street *then* east of block 42 ; and if, in the interval, the river cut the street away ( even so as to encroach on block 42,) and has since receded, it gives no claim to the plaintiffs as riparian owners. 5. But it is submitted that the *recorder* had no right to take evidence respecting the extent and boundaries of land confirmed by the old board, and that all such evidence and the survey are altogether without authority and void. ( 3 U. S. S. at large, p. 750.) 6. If this be so, the confirmation under the old board remains unsurveyed, and can only be designated as bounded on all sides by streets.

SCOTT, Judge, delivered the opinion of the court.

Our duty in the present case only requires of us an examination of the title of the plaintiffs, who are appellants here seeking to deprive the city of a lot of ground of which she is now possessed. If, under these circumstances, the plaintiffs fail to show a right to recover, it is obvious that the defendant cannot be disturbed and is not bound to show her title.

From the view we take of the law, we are confined to the survey made under the confirmation, through which the plaintiffs claim, in order to ascertain the limits and extent of their rights. In the case of *Menard's heirs* v. *Massey*, 8 How.

303, the Supreme Court says, " when a survey is made and the field notes returned to the surveyor general's office, it was conclusive evidence, as against the United States, that the land granted by the confirmation of congress was the same described and bounded by the survey, unless an appeal was taken by either party, or an opposing claimant, to the commissioner of the general land office. This consideration depends on the fact that the claimant and the United States were parties to the selection of the land, for, as they agreed to the survey, they are mutually bound, and respectively estopped by it."

This being so, and the survey of the confirmation bounding it on the east by Main street, as surveyed by the United States on the 15th of September, 1835, it is not conceived that there can be any serious controversy in relation to this matter. There is no doubt that many concessions of lots in St. Louis were granted under the Spanish government, with boundaries fronting on the river. Auguste Chouteau, in 1825, filed among the archives of the city of St. Louis a plat of the said city, as it was designed by him as its founder. He did not pretend, however, that the plan was made in virtue of any public authority. This plat shows that there was a vacant space left between the river bank and the lots fronting on Main street on the west. In June, 1810, the first board of commissioners for adjusting land titles in Missouri, while acting on a claim of Julian Papin Benito, which was for a lot back to the river from another lot adjoining Main street, says, " it is the opinion of the board that this claim ought not to be confirmed. This space has been termed the bank of the Mississippi. The lots between the Main street and the Mississippi being 150 feet only, as appears by the plat of the town of St. Louis, recorded by Pierre Chouteau and others in behalf of the inhabitants of said town, as also in all the old concessions given for said lots ; and it appears from said plat that a nearly similar space of ground exists between the Mississippi and all the other lots that are situated between the Mississippi and Main street." As these facts are related merely as a matter of history, the im-

portance due them, whatever it may be, is not diminished by the consideration that the claim referred to was afterwards confirmed by Recorder Bates.

The case of *Mullanphy's Ex'r* v. *Daggett & Price*, 4 Mo. Rep. 343, does not affect the matter under consideration. That was an action of trespass *quare clausum fregit*, for injuries done on the Yosti concession, which, though bounded on the east by the river, was situated north of the old Spanish town.  At the time of the commission of the wrong for which the suit was brought, it was included within the limits of the city, and the court held that the owner had such an interest in the bank of the river as would sustain the action, though the right of the public to the use of it, for some purposes, was recognized.

The case mainly relied on by the plaintiffs is that of *Morgan* v. *Livingston*, 1 Con. Lou. Rep. 451.   Whatever may be the law in relation to the rights of riparian owners, under the French, Spanish or common law, we do not conceive that it affects this suit, as the boundary is not the river, but a street in the city of St. Louis.   It appears that, by the Spanish law, although a public road was between his land and the river, a riparian owner was entitled to all alluvial accretions, for the reason that, by the law of Spain and the conditions of his grant, he was bound to the confection and the repair of the road, its ditches and bridges, and the levee ; and if any part of the soil, which was covered by them, was carried away by the stream, the riparian estate would yield a quantity of land equal thereto.   The bank of the river was to the riparian owner, alternately, an onerous and a beneficial accessory.   This principle, it seems, was applicable to private riparian property, laid off into town lots merely by the act of the owner, without any authority of law.   But, in towns erected by legal power, the lots were not charged with any of the burdens attending rural riparious estates ; the levee, road or street being made and kept in repair at the joint expense of the owner of every lot in the city.

St. Louis was first incorporated on the 9th of November,

1809, by the Court of Common Pleas for St. Louis county, under and by virtue of the act of the territorial legislature of June 18th, 1808, with limits including the block in controversy, and with authority to erect and repair bridges, and to cause the streets to be cleared and repaired by the inhabitants thereof. As the claim of the plaintiffs was not a perfect one under the Spanish government, its confirmation and the ascertainment of its boundaries was a duty assumed by the United States. That duty has been performed, and the plaintiffs have accepted from the government a boundary which limits them to a street in an incorporated town. Now, although their original grant or concession was to be interpreted by the laws of Spain, and although it may have called for the river as a boundary, yet, having accepted as a boundary a street in an incorporated town, they cannot now fall back on the terms of their original concession.

In coming to this conclusion, we do not wish to be understood as intimating the opinion that the plaintiffs' eastern boundary, from the evidence, was not properly located on Main street. We do not go into an examination of that question. Nor do we wish to be understood as expressing any opinion in relation to the rights of riparious owners of lots in the city of St. Louis, nor as intimating that the town of St. Louis, in regard to riparian proprietors, stood on no other ground than a private grant, bounded by a water-course, under the Spanish government. We are not aware that the Spanish law in relation to riparian grants on the Mississippi, in Louisiana, has ever been considered as obtaining in Missouri.

There is a strong similarity pervading the French, Spanish, and common law codes in relation to alluvial accretions. Each system may have its peculiarities, but the main features of them nearly resemble each other. It is certain that the United States never made any grant of lands encumbered with the conditions annexed to grants of land on the Mississippi under the Spanish government. In the states of the Union, that gov-

ernment would have no such authority, as it would be a mere police regulation, outside of its constitutional powers.

From what has been said, it will appear that the admission made on the trial that all the land in front of that which is embraced within the lines of block 42, including the present Main street, has been formed by accretion since 1840, cannot affect the judgment.

Judge Ryland concurring, the judgment will be affirmed.