SWERINGEN v. ST. LOUIS et al., Appellants.

Division Two, July 3, 1899.

1. **Accretions:** ACTUAL CONTIGUITY. Any separation of the claimant's land from the alluvion by the lands of another, however narrow the intervening strip or whatever the size of the claimant's tract behind it, precludes his right to the accumulated alluvion.

Sweringen v. St. Louis.

2. ——: ——: BETWEEN HIGH AND LOW WATER MARK. So that, where the river is not mentioned as a boundary in the patent, but the boundary is a permanent line fixed by courses and distances, metes and monuments "between high and low water mark," and the accompanying survey exhibits a tract of fourteen acres between the boundary of the survey and the river, the patentee was not a riparian owner and his heirs had no accretion right to the alluvion, and could not recover it.

3. ——: POSSESSION: TAXES, ETC. Payment of taxes, cutting timber off of land, and occasional disturbance of squatters thereon does not constitute possession or create title.

4. ——: ——: SQUATTER'S POSSESSION. A squatter on "made" land can not claim by adverse possession any more of the land than he had in actual possession, unless he can also show that the land is an accretion to his shore land.

*Appeal from St. Louis City Circuit Court.*—HON. JOHN M. WOOD, Judge.

REVERSED.

B. SCHNURMACHER and CHAS. CLAFLIN ALLEN for appellants.

(1) The Labeaume patent, under which plaintiff claims title, does not make the Mississippi river the boundary of the grant; therefore, the property therein embraced was not riparian, and was not entitled to the accretions made by the river. Smith v. Public Schools, 21 Mo. 36; Cook v. McClure, 58 N. Y. 437; Dunlap v. Stetson, 4 Mason 349; Child v. Starr, 4 Hill 369; Bradford v. Cressey, 45 Me. 9; Daniels v. Railroad, 20 N. H. 85; Healey v. McCormick, 3 Kernan 296. (2) Even on the assumption that plaintiff was a riparian owner, and that she was entitled to accretions between extended side lines, she has shown no continuous seizin or possession of any property east of her original lots, so as to connect the same by continuous accretions with the property in controversy, and establish a basis for recovery. (3) The city having expended large sums of money for building dykes and

revetments in order to construct a great public wharf under ordinance 5403, providing a complete wharf system for the entire river front of the city; having granted a license to the railroad company to use a part of the unimproved wharf thus formed; having leased a part to defendant, Joy; and the railroad company having also expended large amounts for the connection of its great railway system; and plaintiff, having stood by for years in silence, and having permitted these public improvements to be made, is estopped from maintaining ejectment against either the city or the railway company. Dodd v. Railroad, 108 Mo. 581; Provolt v. Railroad, 57 Mo. 256; Masterson v. Railroad, 72 Mo. 633; Kanaga v. Railroad, 81 Mo. 126; McClellan v. Railroad, 103 Mo. 295; Railroad v. Town Site Co., 103 Mo. 466; Avery v. Railroad, 113 Mo. 561; Webster v. Railroad, 116 Mo. 117; Scarrett v. Railroad, 127 Mo. 298; St. Joseph v. Landis, 54 Mo. App. 326; Planet Property and Financial Co. v. Railroad, 115 Mo. 613; House v. Montgomery, 19 Mo. App. 170; Gibson v. St. L. A. & M. Ass'n, 33 Mo. App. 165; School Dist. v. Lindsay, 47 Mo. App. 134.    (4)    Several streets intervened between plaintiff's lots and the river, thereby effectually preventing accretions from attaching themselves to these lots.    Smith v. Public Schools, 21 Mo. 36; Smith v. Public Schools, 30 Mo. 290; St. Louis v. Lemp, 93 Mo. 437; Ellenger v. Railroad, 112 Mo. 526; Tatum v. St. Louis, 125 Mo. 657; St. Louis v. Railroad, 114 Mo. 13.    (5)    The defendant having created the land in controversy for the express purposes of a wharf, and having held open, notorious, continuous, adverse and peaceable possession for more than ten years before the bringing of this action, title is in defendant, the city of St. Louis.    Mather v. Walsh, 107 Mo. 121; White v. Keller, 114 Mo. 479; Wilkerson v. Eilers, 114 Mo. 245; Sherwood v. Baker, 105 Mo. 472; Long v. Stock Yards Co., 107 Mo. 304; Allen v. Mansfield, 82 Mo. 693.

E. P. JOHNSON and THOS. A. RUSSELL for respondent.

(1)    Aside from the other statements in the Labeaume patent in connection with the Soulard survey, in regard to accretions, by which the patent clearly conveyed such accretions as had formed, in express terms, and by mentioning the fact that they were rapidly advancing, clearly manifested in intention to secure to the grantees such as should thereafter form, the call in it, "From the corner F, down the right bank of the Mississippi river, with the meanders thereof, between high and low water mark, . . .   to the beginning corner," which was "a stake set on the right bank of the Mississippi river between high and low water mark," constituted the grantees named in it riparian owners.   Lebeau v. Gaven, 37 Mo. 556; Perkins v. Adams, 132 Mo. 131; Minton v. Steele, 125 Mo. 181; Tatum v. St. Louis, 125 Mo. 647; Railroad v. St. Louis Union Stock Yards, 120 Mo. 552; Crandall v. Allen, 118 Mo. 403; Cooley v. Golden, 117 Mo. 33; Naylor v. Cox, 114 Mo. 232; St. Louis v. Railroad, 114 Mo. 13; City v. Lemp, 93 Mo. 477; Campbell v. Laclede Gas Light Co., 84 Mo. 352; Meyers v. St. Louis, 82 Mo. 374; s. c., 113 U. S. 566; Gould on Waters, secs. 194-197.   (2)   The plat of the Soulard survey is embraced in this patent and there is no question but what it extended to the river.   The plat of U. S. survey No. 3333, is also embraced in it and delineated the river, and although a sand beach is marked on it with the surveyed eastern line between it and the river bank, this sand beach is clearly marked as the Mississippi river, but if this mark were not on the sand beach, this plat, especially with the dotted line extending the northern line of it across the sand beach, beyond question goes to the river, and it is conclusive that the premises embraced in the patent extend to the river. Gould on Waters, sec. 69; Bates v. Railroad, 66 U. S. 204; Railroad v. Schurmeir, 74 U. S. 284; Jourdan v. Barrett, 45 U. S. 169; Lindsey v. Hawes, 67 U. S. 554; Church v.

Grundy, 5 Dana (Ky.) 100; Houck v. Yates, 82 Ill. 179; Washington Ice Co. v. Shortall, 101 Ill. 46; Middleton v. Pritchard, 4 Ill. 510; Shelton v. Maupin, 16 Mo. 124.

GANTT, P. J.—This is an action of ejectment for the following land in the city of St. Louis. Beginning at a point in the southern line of Buchanan street at the northeast corner of city block No. 2544, of said city; thence southwardly along the eastern line of said block to the southeast corner thereof; thence westwardly along the southern line of said block 150 feet to the southeast corner of city block No. 660 east of said city; thence southwardly to the northeast corner of city block No. 661 east of said city; thence southwardly along the eastern line of said last named block to the southeast corner of the same in the northern line of Branch street; thence eastwardly along the northern line of Branch street extended to the Mississippi river, to said river; thence northwardly along said river to the southern line of said Buchanan street to said river, and thence westwardly along the southern line of said Buchanan street extended to said river, to the point of beginning.

Ouster was laid as of April 9th, 1891.

As a matter of fact, the land which plaintiff seeks to recover is a part of the North Wharf of the city of St. Louis, beginning sixty feet north of Dock street and extending ninety feet wide between parallel lines from the western line of the said wharf eastwardly to the Mississippi river. The plaintiff claims title to the above tract as an accretion to land patented by the United States to Louis Labeaume and his heirs in confirmation of a Spanish concession to William M. Christy and under partition proceedings of the estate of said Christy.

There are various defenses interposed by the city. The first is predicated upon the fact that inasmuch as the plaintiff has absolutely no sort of paper title to the specific land sued for but must recover, if at all, upon a showing that this land

SURVEY Nº 3333. T. 45 N. R. 7 E. 5TH PR MN

PLAT Nº 1.

Vol. 151, p. 352½.

is an accretion formed by the Mississippi river to her title acquired by *mesne* conveyance from Louis Labeaume, it is an indispensable prerequisite that she show that Labeaume himself was a riparian owner.

The patent to Louis Labeaume from the United States is dated March 25, 1852, and recites a confirmation of Survey No. 3333 containing thirty-three and sixty-eight one-hundredths acres, and contains a plat which accompanies this opinion, on which the Labeaume survey is indicated within certain pink lines.

So much of the description of the property included in said survey, as indicates the eastern lines of said survey nearest the Mississippi river is as follows: "Beginning at a stake set on the right bank of the Mississippi river between high and low water mark, and on the extension line produced eastwardly from Labeaume's southern ditch, the lower and most eastern corner of this survey, and the upper and most northern corner of the survey of Joseph Brazeau, numbered three thousand three hundred and thirty-two." . . . (The description then goes inland to the west and north, along the line marked in pink on the plat, until it reaches a point in the old bed of Rocky Branch) . . . "thence north 87 degrees and thirty minutes east, at five chains and forty-six links, a point at the mouth of the Rocky Branch, the northeastern corner of this survey, and a corner to the city of St. Louis, it being the northern termination of the northwestern boundary line thereof." From this corner, which is marked F on the plat, the northwest corner of Second or Main street, and Dock street bears south thirty-seven degrees fifteen minutes west, distant seven chains and seventy-one links, and the point of intersection of the aforesaid city line with the southern edge of Dock street, bears south twenty-two degrees west, distant six chains and sixty-one links, which point of intersection is two · chains and eight links north, sixty-nine degrees east from the southwest corner of Dock street, and Second street, or Main

street.   From the corner F down the right bank of the Missis-
sippi river, with the meanders thereof, between high and low
water mark, south nine degrees east, at eight chains and sixty-
six links a stake, thence south twenty-one degrees east, at
five chains and fifty links a point from which offset north,
seventy degrees east, one chain and eighty-three links to the
center of the water of the Rocky Branch, as running through
the sand beach, six chains and sixty-three links to the bluff of
the sand beach, seven chains and forty-seven links to the
water's edge of the Mississippi river, return to the meandering
line, at ten chains a post, from which the southeast corner of a
stable bears south, forty-two degrees west, distant forty-six
links and the upper point of the entrance of the water of the
Rocky Branch into the Mississippi river, bears south sixty-two
degrees and thirty minutes east, distant sixteen chains, thence
south thirty-four degrees east, at seven chains five links, the
eastern extension of Labeaume's northern ditch from which
the corner mark of D on the plat bears north seventy-four
degrees and thirty minutes east, distant nineteen chains and
seventy-five links, at twenty-five chains a stake, thence south,
twenty-three degrees east, at thirteen chains and sixty seven
links, the northeast corner of Robertson and Patterson's saw
mill, at fourteen chains and eight.links the southeast corner
of said Mill, at twenty chains and fifty-seven links, the south-
east corner of Hendrick's flour mill, nineteen links to the
right, at twenty-three chains and thirty-five links, the north-
east corner of Cochran's saw mill, thirty chains and 95 links,
to the beginning corner."

To the introduction of this patent defendant objected
because on its face and by the plat attached to it and made
a part of it, the property thereby conveyed did not extend to
the Mississippi river, but only to a well defined and permanent
boundary which began at a fixed stake "between high and low
water mark" and continued with the meanders of the river
"between high and low water mark" from the mouth of Rocky

Branch on the north to the point of beginning on the Brazeau survey. This objection was overruled and defendant duly excepted.

It is fundamental in the law of accretions that the lands to which they attach must be bounded by the river or stream to entitle its owner to such increase.

The doctrine is one of compensation. The reason of the law is that every owner of land bounded by a stream of water is subject by reason of the gradual changing of the course thereof to lose a portion of his land, or have the same increased in quantity by the accumulation thereto, and inasmuch as he is wholly without remedy if a loss occurs by the river eating away his banks, he is entitled to whatever increase also that is caused by the gradual accretion or reliction. In the very nature of things then accretions depend upon actual contiguity. Any separation of the claimant's land from the accumulated alluvion by the lands of another, however narrow the intervening strip may be or whatever the size of the claimant's tract behind it, precludes his right to the alluvion. [1 Am. and Eng. Ency. of Law (2 Ed.), 473, note 2 and cases cited; Gould on Waters (2 Ed.), sec. 155, note 1; Ellinger v. Railroad, 112 Mo. 525; Smith v. St. Louis, 21 Mo. 36.]

Now, in the patent to Labeaume the river is not mentioned as a boundary. On the contrary the eastern boundary is a permanent line fixed by courses and distances, metes and monuments "between high and low water mark," and the accompanying survey exhibits a tract of fourteen acres or more between the eastern boundary of the survey and the river itself. To the east of the pink line which borders the survey of 1852 lies a larger "sand beach," which separates the river from the Labeaume survey.

We are unable to agree with counsel for plaintiff that the plat to the patent carries the north line of the survey by a dotted line across the said beach. On the contrary we think it is plain that this dotted line from the point "F" marks the

then northern limits of the city and not of this survey. The plats and the language of the survey alike bring us to this conclusion. It follows that the effort to bring this case within the doctrine of Shelton v. Maupin, 16 Mo. 126, must fail because there is no evidence that the lines of this survey ever ran to the river.

Whatever may have been the original Spanish concession the survey and patent made under the confirmation in 1852 must control as to the extent of Labeaume's right. [Smith v. St. Louis, 21 Mo. 36.]

A great number of cases decided by this court are cited by the plaintiff to sustain her claim that the call for the eastern boundary constitutes the grantees in the Labeaume patent riparian owners. [LeBeau v. Gaven, 37 Mo. 556; Perkins v. Adams, 132 Mo. 131; Tatum v. St. Louis, 125 Mo. 647; Crandall v. Allen, 118 Mo. 403; Naylor v. Cox, 114 Mo. 232; and others.] A very cursory reading will demonstrate that in each of these cases the river itself was a boundary line and no other lands intervened between the river and the riparian claim.

A case strikingly in point is Dunlap v. Stetson, 4 Mason 349, decided by Judge STORY. The contest in the case grew out of the description of the deed of Budge to McGlathry. The description was as follows: "A certain lot of land lying and being in Bangor on Condeskeig point, so called, bounded and described as follows, to wit, beginning at a stake on the west bank of Penobscot river, near a thornbush marked on four sides, running north eleven rods to a stake and stones; thence southerly to a stake and stones, a corner, thence south nine rods to a stake and stones on the same bank of the same river; thence running on the western bank to high water mark sixteen rods to the first mentioned bounds with all the privileges of water and landing to the same belonging." The colonial act of Maine, 1641, gave the proprietor of lands in all coves, creeks, about and upon salt water, propriety to the

low water mark "where the sea doth not ebb above one hundred yards and not more where it ebbs further." The question was whether McGlathry by the foregoing description took as riparian owner the flats in front of the land described in the deed or whether he was limited to high water mark on the western bank of the Penobscot. The court held he did not take as a riparian owner the lands in his front, saying: "It is to be observed that it is not a deed bounding the grantee on the river or the stream of the river, generally where the flats might pass by implication, but the boundaries are specific and definite."

There, as in this case, the front line was restricted to the definite, surveyed line, not to the river itself. Here it is the specific line between high and low water mark, and can not be extended to the large area then and now existing between that line and the river itself.

So in Cook v. McClure, 58 N. Y. 437, the court of appeals conceded for argument's sake that where a boundary line was the bank of a pond the doctrine of accretions would apply, yet where the line instead of being the pond itself was a line "commencing at a stake near the high water mark of the pond and running thence along the high water mark to the upper end of the pond," it was held such a line was a fixed and permanent one and did not change as the water rose or receded and consequently was not entitled to accretions. But we need not go further than our own decisions.

In the case of Smith v. St. Louis Public Schools, 30 Mo. 290, this whole question was thoroughly examined and discussed in the light of Spanish and French law, and it was held that the doctrine of accretion was inapplicable to what are termed limited fields, that is, such as have a definite, fixed boundary line other than the river, and in that case it was held that where a street was dedicated to the public between the lot and the river the right of accretion did not attach to the lot and the street fixed the boundary of the lot. That case has

since-been uniformly followed by this court.   [Ellinger v. Railroad, 112 Mo. 525.]

The tract in this case was confirmed not only by fixed boundaries other than the river, but the exact number of acres was specified within that survey and that survey as to its quantity excludes all idea that the United States was granting the fourteen or more acres lying outside of that survey at the time it was made.

The survey moreover says that Soulard's survey did not describe the meanders of the Mississippi or of Rocky branch, and it was impossible to determine whether the difference in area was the result of miscalculation by Soulard or by the accretions, but whatever the cause of the discrepancy, the United States confirmed the last survey which nowhere calls for the river as a boundary.   And by that patent all these questions must be held to be forever settled.

Our conclusion is that as Labeaume was not a riparian owner, his heirs or grantees can not recover the tract in suit as an accretion.   The court therefore erred in admitting the patent as any evidence of title to the land in suit as it did not purport to convey it to Labeaume.

Plaintiff then having no paper title to the land in suit is remitted to an actual, continuous adverse possession of the tract as her basis for recovery.   She has no color of title by which her possession of a part can extend to the whole.

What evidence then is there in the record of such possession as would ripen into a title?   By the form of her action she admits the possession of defendant and the defendant in possession may rest upon that possession until plaintiff exhibits a better title.   Plaintiff must recover upon the strength of her own title and not upon the insufficiency of the defendants.

Plaintiff has shown no continuous, if any possession, of the property in suit.   There is not a pretense that the same was ever inclosed by a fence or that plaintiff had any buildings

·or permanent structure of any kind or character on this par-
·ticular land.

There is no proof of any actual ownership or claim thereof
in the record.

On the contrary the proof appears quite conclusive that
·she recognized the city's right to a wharf.   The plat which
she introduced to show the mutual agreement between Mrs.
Tyler by Silas Bent on one side and Sallie McPheeters, Mary
B. Scott and Julia Crosby by W. M. McPheeters, shows among
other things that in 1873 the 90 feet herein sued for was des-
ignated on the plat as an extension of lots 3334 and 35, and
the prolongation brought it to another tract marked "Wharf,"
.and there it terminated.   This tract was marked Mrs. Martha
T. Sweringen. ·

On the trial plaintiff's counsel distinctly announced they
would be bound by this map or plat.   In a word twenty-two
years before the commencement of this action it appears this
land was a part of a public wharf and none of the persons who
had that property surveyed were making any claim to the land
in dispute in this action.   Another significant fact is this:
Kennett, now Hall, street was opened by condemnation pro-
·ceedings in 1870.   This street is east of plaintiff's original
lots.   The property east and west of Kennett street which is
within the extended side lines of plaintiff's original lots was
platted and treated as the property of the Tyler and Buchanan
Heirs and Liebke and Schrage were made parties to the pro-
ceeding as lessees of the Buchanan heirs.   Damages were
.assessed in favor of the Tylers and Buchanans.   Plaintiff,
Mrs. Sweringen, was made a party to that suit and benefits
were assessed against her lots in Block 308 E to pay the
assessment to the Tylers and Buchanans, and they were sold
to and afterwards in 1879 plaintiff bought her lots from the
·city.

Notwithstanding all this property was platted as belong-
ing to others, and that she was served with process she·per-

mitted those proceedings to go without objection.   Neither plaintiff nor her agents made the slightest claim of ownership of this tract at that time.

The tax receipts disclose that since 1874 the plaintiff did not pay on the land sued for.   She did return her property west of the wharf line in Block 2544 but the receipts do not corroborate the oral testimony that she paid on the tract in suit, but most clearly disprove it.   Her receipts show the land on which she paid was bounded on the east by the wharf and neither the plaintiff or her agents objected to such a description.   So much for the negative aspect of her adverse possession.

The affirmative proof was as follows:

J. V. S. Barrett, a grandson of plaintiff, testified in connection with a plat prepared by Joyce that in 1868 or 1869 when about eight years old he went, with his grandfather Sweringen and Captain Silas Bent, to the tract in suit to have it surveyed.   He testified that Mrs. Sweringen had a house on her lot west of this tract.   Squatters had shanties on it up to December, 1890, plaintiff had absolutely no improvement of any kind on this particular property.   It is true he says Mrs. Sweringen paid taxes to the river, but as her tax receipts produced on the demand of defendant shows that from 1874 to 1895, inclusive, she paid on no property east of City Block 2544, he is obviously mistaken. .

Mr. Chas. T. Farrar testified that he had charge of plaintiff's property from Second street to the river from 1875 to the trial and paid her taxes.   On several occasions he put some squatters off of the land east of City Block 2544, since the railroad was built and Mr. Joyce had taken possession, Joyce testified he had surveyed the ground marked on plat No. 2 at the request of plaintiff's attorneys and this property was then designated on the plat as bounded by the wharf on the east. He had extended the green lines down to the river three or

# EXHIBIT A.

four days before the trial at the request of plaintiff's attorneys.

Various tax receipts from 1857 to 1870, were introduced.

Taking the various descriptions, the width and the depth, it would seem that prior to 1870 plaintiff did not pay taxes east of Main street. But conceding the full force of this evidence as to the payment of taxes on this vacant land and the sporadic expulsions of squatters on the sand beach, it is settled law in this State that the payment of taxes of itself does not show possession of land or create title. [Chapman v. Templeton, 53 Mo. 463 ; Cashman v. Cashman's Heirs, 123 Mo. 647.]

Equally unavailng was the occasional disturbance of the squatters by Mr. Farrar. It was ruled in Pharis v. Jones, 122 Mo. 125, that payment of taxes, cutting timber thereon and keeping off trespassers did not constitute possession.

It follows that plaintiff introduced no evidence to show possession or seizin of the tract sued for within ten years before the commencement of her action, and the circuit court erred in not so holding as plaintiff had no paper title drawing to her the possession.

In view of this conclusion we do not deem it necessary to enter upon a discussion of various other incidental questions which arose in the case.

In our opinion there was no evidence to sustain the judgment of the court and it is accordingly reversed. SHERWOOD and BURGESS, JJ., concur.