STATE OF NORTH CAROLINA v. JAMES E. JOHNSON, JR.; AL-
BERT S. KILLINGSWORTH AND WIFE, ELIZABETH E. KILLINGS-
WORTH; AGNES M. COCKE MAYER, TRUSTEE; HUGH M. MORTON
AND WIFE, JULIA T. MORTON; WILLIAM L. HILL II, TRUSTEE;
THE SOUTHERN NATIONAL BANK OF NORTH CAROLINA;
MICHAEL DeLOACH; DEL-COOK LUMBER COMPANY, INC.;
AND WESTWIND CORPORATION, ORIGINAL DEFENDANTS, FRANK
O. SHERRILL AND WIFE, RUTH J. SHERRILL, ADDITIONAL DEFEND-
ANTS

No. 55

(Filed 10 March 1971)

1. Eminent Domain § 7— amendment of complaint — filing of supple-
mental memorandum by condemnor

The statutory requirement that, upon the amendment of any com-
plaint and declaration of taking "affecting the property taken," the
condemnor must file with the register of deeds a supplemental memo-
randum of action setting forth the names of the interested parties
and the description of the property, *held* inapplicable where the amend-
ment merely adds additional parties defendant and substitutes a more
specific description of the condemned land for the original description
in the complaint. G.S. 136-104.

2. Statutes § 5— statutory construction

Words of a statute must be construed, insofar as possible, to
effectuate the legislative intent.

3. Eminent Domain § 7— supplemental memorandum of action — requisi-
tes of filing

The filing of the supplemental memorandum of action pursuant to
G.S. 136-104 is required only where the condemnor's amendment to
the complaint and declaration of taking affects the property taken.

4. Eminent Domain § 7— condemnation by Department of Administra-
tion — Fort Fisher Historic Site — compliance with statutory pro-
cedures — findings of fact

Trial court properly ruled that the State of North Carolina, acting
through the Department of Administration, complied with applicable
statutory requirements prior to the institution of its action to con-
demn lands adjacent to Fort Fisher Historic Site, where there were
findings of fact, supported by competent evidence, that (1) the De-
partment of Archives and History had applied to the Department of
Administration for the acquisition of all "the subject lands" described
in the complaint; (2) the Department of Administration made a full
and adequate investigation of the land to be condemned; and (3) the
Department of Administration made a specific determination that the
acquisition of the land was in the best interest of the State. G.S. 146-23;
G.S. 146-24(a).

State v. Johnson

5. Appeal and Error § 57— findings of fact — conclusiveness on appeal

Findings of fact by the trial court, if supported by any competent evidence, are conclusive on appeal, and this is so notwithstanding evidence to the contrary.

6. Deeds § 26— effect of Torrens registration — publication of notice

A recital in a final Torrens decree of registration that "publication of notice has been duly made" is conclusive evidence of that fact, and a party may not thereafter show that the Torrens proceeding was publicized for only four weeks instead of the required eight weeks. G.S. 43-10; G.S. 43-26.

7. Statutes § 6— construction of provisos

The words of a proviso must be construed to effectuate rather than to defeat the purpose of the statute.

8. Waters and Watercourses § 6— navigable waters — accretion and avulsion

"Accretion" denotes the act of depositing, by gradual process, of solid material in such a manner as to cause that to become dry land which was before covered with water; it is the opposite of avulsion, which is the sudden and perceptible gain or loss of riparian land.

9. Waters and Watercourses § 6— effect of accretion — boundary line of lands joined by accretion

Where accretions form on each side of a body of water and eventually meet, displacing the water which formed the boundary, a new property line is formed at the point of contact, and the body of water is no longer the boundary.

10. Waters and Watercourses § 6— boundary line of coastal properties joined by accretion — effect of avulsion

In determining the boundary line of properties that had been situated north and south of a coastal inlet until the inlet was closed in 1933 by the natural fillings of sand (accretion), the southern boundary of the property lying north of the inlet was fixed on the ground at the point where the accretion acting from the north of the inlet finally connected with the accretion acting from the south to close the inlet; the location of the boundary line so formed was affected neither by the avulsive opening in 1944 of a new inlet north of the pre-1933 inlet nor by the imperceptible southward shifting of the 1944 inlet towards and through the location of the pre-1933 inlet.

11. Deeds § 26— assertion of right-of-way over land registered under Torrens Act — failure to show compliance with Torrens Act

Claimants failed to establish a right-of-way over lands the title to which was registered under the provisions of the Torrens Law from 1916 to 1966, where the deed on which the claimants based their right-of-way was not recorded in the Torrens registration of title book, nor was there any notice of the existence of the right-of-way in the Torrens registration book or upon the Torrens Certificate of Title. G.S. 43-18; G.S. 43-22.

---

State v. Johnson

---

12. **Easements § 2— right-of-way by reservation — ownership of the land affected by right-of-way**

The claimants of a right-of-way by reservation must show ownership in the lands over which they purportedly reserved a right-of-way.

13. **Trespass to Try Title § 2; Adverse Possession § 21— condemnation proceeding — presumption that title is out of the State**

In a condemnation proceeding in which the State was a party for purposes of the condemnation but in which the question of land ownership was between individual litigants, there is a statutory presumption that title is out of the State. G.S. 1-36.

14. **Ejectment § 6— proof of ownership of land — reliance upon title**

In an action of ejectment and in other actions involving the establishment of land titles, he who asserts ownership must rely upon the strength of his own title.

15. **Adverse Possession § 25— color of title — requirement that description in deed must fit the land — sufficiency of evidence**

Individual litigant in a condemnation proceeding failed to establish his ownership by adverse possession under color of title in the lands sought to be condemned by the State, where (1) the descriptions in the deeds offered by the litigant were never fitted to the land in controversy and (2) the evidence of adverse possession was inadequate.

Justice MOORE did not participate in the consideration or decision of this case.

Chief Justice BOBBITT concurring.

Justice SHARP joins in concurring opinion.

APPEAL by Additional Defendants, Frank O. Sherrill and wife Ruth J. Sherrill, from judgment of *Cowper, J.,* at March 31, 1970, Special Session, NEW HANOVER Superior Court. The appeal was transferred from the Court of Appeals to the Supreme Court under general order of this Court dated July 31, 1970, and docketed and argued as No. 91 at the Fall Term 1970.

Action by plaintiff against the original defendants to condemn a certain tract of land described in the complaint. The action was commenced June 28, 1968, by the filing of the complaint and declaration of taking, the deposit in court of the sum of $237,500 as estimated compensation, and the issuance of summons. The original defendants were served with copies of the complaint and declaration of taking and notice of deposit.

On February 13, 1969, the State filed an amendment to its complaint and declaration of taking and notice of deposit

making Frank O. Sherrill and wife Ruth J. Sherrill additional parties defendant and alleging that the Sherrills have or claim to have an interest in the land condemned by virtue of a deed from Sherrill and wife to Hugh MacRae and Company, Inc., dated December 9, 1943, recorded in Book 355, page 209, New Hanover County Registry, in which deed the Sherrills purportedly reserved a right-of-way from their lands to the southern end of U. S. 421 south of Old Fort Fisher. (Exhibit P-8) The amendment, together with notice thereof, was served on all of the original defendants except Michael DeLoach, Del-Cook Lumber Company, Inc., and Westwind Corporation, who in their answers disclaimed any interest in the land. The defendants' Sherrill were the only defendants who filed answer to the amended complaint, and they alleged in effect that they have an easement across the lands condemned by virtue of said deed and further alleged that they were the owners in fee simple of all the land, beach land, and marsh land lying south of a certain agreed boundary line shown on a map or plat recorded in Book 355, page 211, in the New Hanover County Registry. (Exhibit M-14)

On April 7, 1970, the State again amended its complaint and declaration of taking by striking Paragraph 13 of the complaint and inserting a new Paragraph 13 containing a specific description by metes and bounds of 333.518 acres of land condemned in lieu of a more general description of said land initially used in the complaint.

The cause came on for hearing before Cowper, J., pursuant to G.S. 136-108, to determine all issues raised by the pleadings other than the ultimate jury issue of just compensation. At that hearing the parties stipulated and agreed that, except for the issue of compensation, the pleadings raise only the following issues: (1) Has the State complied with the statutory requirements necessary for the taking of the lands in this action? (2) What is the status of title to the area between high and low water marks? (3) What is the status of title as between the defendants?

All parties were present with their counsel and presented evidence in support of their contentions. The court, having considered the pleadings, the evidence presented, and the argument of counsel both oral and written, made findings of fact with

respect to each issue. These findings are quoted in the numbered paragraphs below:

"ISSUE I. FINDINGS OF FACT

"1. This action was duly instituted on the 28th day of June, 1968, by the issuance of Summons, filing of Complaint and Declaration of Taking and Notice of Deposit, and by the depositing of $237,500.00 as estimated just compensation; that memorandum of action was duly filed in the Office of the Register of Deeds; that the lands sought to be condemned are those described in the Complaint and Declaration of Taking and more specifically described in the Amended Complaint and Declaration of Taking and shown on the State's map hereinafter referred to; that the estate sought to be condemned is an estate in fee simple; and that the State fully complied with all procedural matters set forth in Article 9 of Chapter 136 of the General Statutes of North Carolina.

"2. That all parties were duly served and answered in apt time; that all parties were properly before the court.

"3. That a map of the property condemned was filed in apt time and prior to the hearing, the purpose of which was to settle all issues raised by the pleadings, other than the issue of just compensation as provided in G.S. 136-108.

"4. That the North Carolina Department of Archives and History, pursuant to a resolution adopted, applied to the Department of Administration for acquisition of the subject lands, said resolution setting forth the needs of the Department of Archives and History to acquire the lands; that the Department of Administration, through its duly qualified and acting State Property Officer, immediately investigated all aspects of the requested acquisition, said investigation being based upon substantial information delivered to him by the Department of Archives and History resulting from an extensive investigation made by that department, a map of the lands desired to be acquired, and was based upon the personal knowledge of the lands by the State Property Officer. Considering that the unique nature and historical value of Fort Fisher was in imminent danger of and was, in fact, being destroyed, that the preservation of the Fort and adjacent lands was needed, that no other land, state owned or otherwise, could serve the purposes and needs of the Department of Archives and History, and that funds were avail-

able to pay for said lands if acquired, the investigation was full and adequate under the circumstances. That the Department of Administration through the State Property Officer reported to the Governor and Council of State the results of the investigation and recommended that the acquisition of the lands was needed by the Department of Archives and History and that it was the determination of the Department of Administration that it was in the best interest of the State to acquire the same, and that said lands were thought to contain 270 acres and to run southwardly from the Fort itself to the inlet. That by resolution of the Governor and Council of State, the Department of Administration was authorized and instructed to acquire said lands even by condemnation if necessary to effect the acquisition. That the Department of Administration proceeded to negotiate with the owners of the lands for the purchase thereof, but the negotiations with the owners were unsuccessful and the office of the Attorney General was thereupon requested to institute this action to acquire said lands by condemnation. That the requirements of Article 6, Chapter 146 of the General Statutes of North Carolina were fully complied with prior to the institution of this action.

"ISSUE II. FINDINGS OF FACT

"1. That the waters adjoining the lands condemned as shown on the State map are the Atlantic Ocean, the inlet and Still Water Bay. The evidence clearly establishes that all of these waters are used for navigation and are navigable, in fact.

"2. That the deed under which Johnson and Killingsworth and their predecessors in title claim title calls for the low water mark of the Atlantic Ocean, the inlet and Still Water Bay as boundary lines.

"3. The defendants did not offer in evidence any grant from the State, authorized by any legislation of the General Assembly, to cover any lands below the high water mark.

"ISSUE III. FINDINGS OF FACT

"1. That the Defendants Michael DeLoach, Del-Cook Lumber Company, Inc., and Westwind Corporation, by their Answers filed in the cause, have and claim no interest in the lands condemned.

"2. That the Defendants William L. Hill, II, Trustee, and the Southern National Bank of North Carolina, have an inter-

est in approximately 28 acres of condemned land by virtue of a Deed of Trust to the Trustee for the bank dated June 6, 1968, and duly recorded in Book 834, Page 227, New Hanover County Registry.

"3. That Agnes M. Cocke Mayer, Trustee, and Hugh M. Morton and wife, Julia T. Morton, have an interest in said condemned lands by virtue of a Deed of Trust dated the 5th day of July, 1967, and recorded in Book 813, Page 26, New Hanover County Registry, subject, however, to the release of 83.4 acres, more or less to Johnson and Killingsworth by Deed of Release dated 5 June, 1968, and recorded in Book 834, Page 221.

"4. That the Defendants James E. Johnson, Jr., Albert S. Killingsworth and wife, Elizabeth E. Killingsworth (herein referred to as Johnson and Killingsworth) and Agnes M. Cocke Mayer, Trustee, Hugh M. Morton and wife, Julia T. Morton (herein referred to as Morton) all claim the subject lands under a basic common chain of title. The defendants Johnson and Killingsworth did not offer in evidence, as a part of their chain of title, the map, Exhibit M-14, which followed Exhibit P-8, Deed from Sherrill, *et ux*, to Hugh MacRae & Company, Inc.

"5. The defendants named in finding of Fact #4 proved a connected chain of title beginning with a deed dated February 25, 1884, and recorded in Book UUU, Page 140, New Hanover County Registry covering the extreme north portion of the lands condemned and a grant from the State of North Carolina dated March 15, 1887, and recorded in Book 1, Page 601, New Hanover County Registry, covering the remaining north portions of the lands condemned. The southern boundary of the lands granted by the State in 1887 was an inlet.

"6. That in the year 1916 the then owners of said lands instituted a proceeding under the Torrens Act and secured a decree dated July 28, 1916, which decree was approved by a Superior Court Judge on August 16, 1916, and duly recorded in the Registration of Title Book in the Office of the Register of Deeds of New Hanover County. The lands described in said proceeding had as their southern boundary the inlet above referred to.

"7. Thereafter there were eight certificates duly filed in the Registration of Title Book transferring the entire interest in the lands, with Certificate #8 registering the lands in the name of Hugh MacRae & Company, Inc., which Certificate #8

was duly filed in the Registration of Title Book on January 25, 1935.

"8. That the lands lying south of the inlet referred to in the above mentioned State grant were claimed by Frank O. Sherrill and wife, Ruth J. Sherrill, or their predecessors in title, and said inlet was the boundary line dividing the properties claimed by Sherrill and those owned by Hugh MacRae & Company, Inc.

"9. That in the early 1930's, said inlet closed by natural filling of sands and Hugh MacRae & Company, Inc., the registered title owner of the lands north of the former inlet, and Frank O. Sherrill and wife, the claimants of the lands south of the former inlet, exchanged deeds dated December 9, 1943, seeking thereby to establish the location of the inlet when it closed. The deed from Frank O. Sherrill and wife to Hugh MacRae & Company, Inc., purported to convey all lands lying north of a line drawn from the center of the second leg of the U. S. Government Rock Dam as said line is shown upon a map attached to said deed, said deed and map being duly recorded in Book 355, Page 209, *et seq.*, New Hanover County Registry and indexed in the general index only in the name of Sherrill and wife, grantors, and Hugh MacRae and Company, Inc., grantee.

"10. That the deed from Hugh MacRae & Company, Inc., to Frank O. Sherrill and wife, also dated December 9, 1943, purported to convey to Sherrill and wife all lands lying south of the above mentioned line. That said deed from Hugh MacRae & Company, Inc., to Sherrill and wife was duly recorded in Book 76, Page 480, Brunswick County Registry but not in the New Hanover County Registry.

"11. That in the deed from Frank O. Sherrill and wife to Hugh MacRae & Company, Inc., referred to in Finding of Fact #9, Sherrill and wife sought to reserve a right of way and easement from the Sherrill lands to Fort Fisher.

"12. There was no entry indicating the existence of either of these deeds or map referred to in Finding of Fact #9, #10 and #11 made in the Registration of Title Book in New Hanover County Registry, and no entry thereof was made upon Certificate #8 held by Hugh MacRae & Company, Inc.

"13. That thereafter in the year 1944, an inlet opened across the beach north of where the inlet above referred to had closed. That this inlet opened upon the lands of Hugh MacRae & Com-

pany, Inc. This 1944 inlet has remained open and active from that date and is the one and the same inlet as that shown on the State's map as the southern boundary of the lands condemned.

"14. That said 1944 inlet has by gradual and imperceptive action of the tide, water, wind and sand, ('forces of nature'), moved southward, eroding lands to the south and depositing and making lands by accretion on the north side thereof. That there has been no sudden or avulsive change in the location of said inlet and all movement has taken place gradually and imperceptively.

"15. That Hugh M. Morton and others by petition in the original Torrens proceeding referred to above in Finding of Fact #6, secured a decree in 1966 declaring the petitioners to be the owners of the land covered by said registration and declaring the title to said land removed from the Torrens system for the purpose of future conveyances. This judgment was duly filed on January 18, 1966, and was duly recorded in the Registration of Title Book in the office of the Register of Deeds for New Hanover County.

"16. From the entry of the decree in 1916 placing the lands under the Torrens Act until the decree of January 18, 1966, removing the title to said lands from the Torrens Act, there was no entry in the Registration of Title Book in the New Hanover County Registry on any certificate or margin thereof which in any way changed the description of the lands from that set forth in the original decree, which said description was set forth in the final decree in 1966, nor was any entry of any kind made in the Registration of Title Book or any certificate issued indicating any claim to any lands or any right of way on the part of Frank O. Sherrill and wife as to the registered lands.

"17. The defendants named above in Finding of Fact #4 completed their chain of title by deed from Morton to Johnson and Killingsworth conveying the lands by the identical description set forth in the original Torrens decree in 1916, running southwardly to the inlet, but excepting lands acquired by the United States of America and the State of North Carolina.

"18. The defendants Frank O. Sherrill and wife sought to prove their claim by introducing a deed from D. C. Boyd to Frank O. Sherrill dated the 29th day of November, 1938, and recorded in Book 66, Page 515, Brunswick County Registry, and thereupon sought to show possession of the lands described in

said deed. These defendants failed to offer any evidence that the lands described in said deed covered the lands or any portion of the lands condemned in this action. Their evidence of possession showed no possession of any of the lands condemned in this action sufficient to perfect title by adverse possession under the laws of the State of North Carolina.

"19. The defendants Sherrill introduced the deed from Hugh MacRae & Company, Inc., to them as set forth in Finding of Fact #10 above which said deed has not been recorded in New Hanover County. This deed does not, nor does any other deed or grant in evidence, purport to convey any right of way to Frank O. Sherrill and wife. The sole evidence of any claim on the part of Frank O. Sherrill and wife for any right of way was that sought to be reserved by them in the Deed to Hugh MacRae & Company, Inc., as set forth above in Finding of Fact #9 and #11."

Upon the foregoing findings of fact Judge Cowper concluded as a matter of law that the State had complied with all statutory requirements necessary for the taking of the lands in question; that the area between high and low water marks is owned by the State of North Carolina subject to the riparian rights of the highland owners; and that defendants Frank O. Sherrill and wife have proved no title to any of the lands condemned in this action and own no right-of-way over the condemned lands. The action was thereupon dismissed as to the additional defendants Frank O. Sherrill and wife. Judge Cowper further concluded with respect to the third issue that defendants James E. Johnson, Jr., and Albert S. Killingsworth and wife, Elizabeth E. Killingsworth, were the owners of all the lands condemned subject only to the two monetary encumbrances set out in Findings of Fact Nos. 2 and 3. Judgment was signed accordingly and Frank O. Sherrill and wife appealed assigning errors discussed in the opinion.

*Stevens, Burgwin, McGhee & Ryals by Karl W. McGhee and Richard M. Morgan, Attorneys for Frank O. Sherrill and wife, Ruth J. Sherrill, defendant appellants.*

*Robert Morgan, Attorney General; Parks H. Icenhour, Assistant Attorney General, for the State of North Carolina, plaintiff appellee.*

*Alan A. Marshall and Lonnie B. Williams (Marshall, Williams & Gorham), Attorneys for James E. Johnson, Jr., Albert S.*

*Killingsworth and wife, Elizabeth E. Killingsworth, defendant appellees.*

HUSKINS, Justice.

We note at the outset that appellants have abandoned their exception and assignment of error addressed to the findings of fact and conclusions of law with respect to the second issue. As to the first and third issues, however, appellants strenuously insist that the trial judge committed reversible error. This requires examination of the exceptions and assignments relating to those issues. We shall deal with them in numerical order.

### ISSUE I

This action was instituted under authority conferred by Article 6 of Chapter 146 of the General Statutes which provides for acquisition of lands on behalf of the State. G.S. 146-24(c), as amended by Chapter 512 of the 1967 Session Laws, provides that if negotiations are unsuccessful, "the Department of Administration may request permission of the Governor and Council of State to exercise the right of eminent domain and acquire any such land by condemnation in the same manner as is provided for the State Highway Commission by article 9 of chapter 136 of the General Statutes." Thus the procedures for acquisition to the time of condemnation are governed by Article 6 of Chapter 146, while the condemnation, if required, is regulated by Article 9 of Chapter 136. Appellants assign errors with regard to both the procedure employed and the condemnation itself.

[1] Appellants contend that the trial judge erred in finding that the State complied with "all procedural matters set forth in Article 9 of Chapter 136 of the General Statutes." The State did not comply, say the Sherrills, with G.S. 136-104 which provides that upon "the amending of any complaint and declaration of taking affecting the property taken" a supplemental memorandum of action must be filed with the register of deeds of the county. This document must contain various information, including names of interested parties, descriptions of the property affected, and the relevant facts about the lawsuit. The State admits that it did not file such a supplement but contends it was not required to do so inasmuch as the amendments to its complaint did not *affect the property taken* within the meaning of the statute.

The complaint and declaration of taking was amended twice. The first amendment added Sherrill and wife as additional defendants and alleged "upon information and belief that . . . [they] have or claim to have an interest in the land described in this Complaint. . . ." The second amendment substituted a new description of the land to be taken for the original description in the complaint.

[2, 3] Words of a statute must be construed, insofar as possible, to effectuate the legislative intent. *Supply Co. v. Developers, Inc.,* 277 N.C. 119, 177 S.E. 2d 273 (1970) ; *In re Dillingham,* 257 N.C. 684, 127 S.E. 2d 584 (1962). The purpose of paragraph one of G.S. 136-104 is to vest title in the State upon the filing of the complaint, the declaration of taking, and the deposit in cash of the estimated compensation. *Highway Commission v. Industrial Center,* 263 N.C. 230, 139 S.E. 2d 253 (1964). The manifest purpose of the second paragraph of the statute is to assure public record of the change in ownership. The second sentence of the second paragraph, with which we are concerned here, was inserted by the 1963 Legislature. It reads: "Upon the amending of any complaint and declaration of taking affecting the property taken, the State Highway Commission shall record a supplemental memorandum of action." The obvious intent of the sentence is to assure that any change in the complaint or declaration of taking that *affects the property* will likewise be entered into the land records of the county. Appellants' contention that said sentence means that a supplemental memorandum of action must be filed as to all amendments, significant or insignificant, to the original complaint is not sound. Where the purpose of the statute is to require notice of ownership, an amendment to the complaint which only adds additional parties defendant who may or may not share in the proceeds requires no supplemental notice to the public. The same is true with respect to an amendment that only substitutes a more specific metes and bounds description for a description less exact, both descriptions covering the same property. We therefore hold that a supplemental memorandum is required only where the amendment to the complaint and declaration of taking *affects the property taken.* This assignment of error is overruled.

[4] Appellants next assign as error the conclusion of the trial judge that the requirements of Article 6 of Chapter 146 of the General Statutes were fully complied with prior to the institution of this action. G.S. 146-23 and 146-24 provide, in substance,

that a State agency desiring to acquire land must file a statement of needs with the Department of Administration, and that department must then investigate "all aspects of the requested acquisition." If that department determines that it is in the best interest of the State to acquire the land, it must negotiate with the owners for its purchase. If the negotiations are successful, a proposal is submitted to the Governor and Council of State for the purchase of the property. If negotiations are unsuccessful the Department of Administration may petition the Governor and Council of State for permission to condemn the land in the manner set out in Chapter 136 of the General Statutes. *State v. Club Properties*, 275 N.C. 328, 167 S.E. 2d 385 (1969).

In the instant case, appellants first contend that the Department of Archives and History made no request for acquisition of all the lands described in the complaint, some 333.518 acres, but requested only an area comprising about twenty-five acres. This contention is based on appellants' interpretation of a letter from the Director of the Department of Archives and History to the Department of Administration which apparently alerted that department to the needs of the Department of Archives and History with respect to the land in question. That letter, in pertinent part, reads: "In pursuance of our telephone conversation of a few minutes ago, the Department of Archives and History hereby requests the Department of Administration, Property Control and Construction Division, to take immediate legal action to stop or prevent any steps or measures which might damage or destroy remains or relics of Confederate Fort Fisher, in the area immediately south of present Fort Fisher Historic Site, in New Hanover County."

[4, 5] The trial court found as a fact that the application was for acquisition of "the subject lands." Findings of fact by the trial court, if supported by any competent evidence, are conclusive on appeal. *Truck Service v. Charlotte*, 268 N.C. 374, 150 S.E. 2d 743 (1966); *Mills v. Transit Co.*, 268 N.C. 313, 150 S.E. 2d 585 (1966); *Wall v. Timberlake*, 272 N.C. 731, 158 S.E. 2d 780 (1968). And this is so notwithstanding evidence to the contrary. *Equipment Co. v. Equipment Co.*, 263 N.C. 549, 140 S.E. 2d 3 (1965); *Highway Commission v. Brann*, 243 N.C. 758, 92 S.E. 2d 146 (1956); 2 McIntosh, N. C. Practice and Procedure (2d Ed., 1956) § 1782(6). Here, the record contains competent evidence that the letter referred to above related to the entire area south of Fort Fisher and that the request was so under-

stood by the Department of Administration, the Governor, and the Council of State. This finding of fact and the conclusion of law based thereon will not be disturbed.

Appellants further contend that no investigation was made of the need of the property condemned, and particularly the southernmost portion comprising the end of the peninsula south of Fort Fisher. They contend that no attempt was made to establish the actual site of Old Fort Fisher for the purpose of determining how best to preserve its historical and archaeological value. The trial judge, however, found as a fact that "the investigation was full and adequate under the circumstances." There is evidence to support that conclusion and it will not be disturbed, notwithstanding that there is some evidence to the contrary. *Highway Commission v. Nuckles*, 271 N.C. 1, 155 S.E. 2d 772 (1967). There is evidence in the record that the Department of Administration had at its disposal reports of the Department of Archives and History relevant to the investigation; that the area was personally visited by representatives of the department; that these representatives flew over the land; and that various maps were consulted. Hence there is evidence to support the findings of the trial judge, and his findings support his legal conclusions. *Highway Commission v. Nuckles, supra.* This assignment is overruled.

Appellants' assignment of error that no report of an investigation was made to the Governor and Council of State is based on the premise that no investigation was made. Inasmuch as we uphold the finding of fact of the trial judge that a full investigation was made, this assignment fails.

Finally, appellants contend that the Department of Administration made no specific finding that the purchase or acquisition of said property is in the best interest of the State. G.S. 146-24(a) provides: "If, after investigation, the Department determines that it is in the best interest of the State that land be acquired, the Department shall proceed to negotiate with the owners of the desired land for its purchase." Since the Department did in fact proceed to acquire the land, it is a permissible inference that such a determination was made. The statute does not require a specific written report that the acquisition is in the best interest of the State. The trial judge found that such a determination was made and the totality of the evidence supports that finding.

It is worthy of note that under present law no request from a State agency is necessary. Chapter 1091 of the 1969 Session Laws, ratified 1 July 1969, empowers the Department of Administration to acquire property "by purchase, gift, condemnation or otherwise" for certain authorized purposes, including the acquisition of " (6) Lands involving historical sites, together with such adjacent lands as may be necessary for their preservation, maintenance and operation." Since this action was instituted before the effective date of that enactment, it does not apply to this litigation. *Ashley v. Brown,* 198 N.C. 369, 151 S.E. 725 (1930). Even so, it would be meaningless to hold this proceeding defective on strained procedural technicalities no longer required.

We hold that the State has complied with the statutory requirements necessary for the taking of the lands involved in this action. The findings and conclusions of the trial judge in that respect will be upheld.

## ISSUE III

[6] What is the status of title as between the defendants? Appellants contend that the Torrens registration of 1916 was invalid for failure to comply with statutory requirements as to publication. Chapter 128 of the 1915 Public Laws amended the Torrens Act to require eight weeks publication instead of four. A publisher's affidavit shows that publication lasted only four weeks. Appellants say this defect is jurisdictional and therefore the lower court erred in finding as a fact and concluding as a matter of law that the property in question was duly registered under the Torrens system from 1916 to 1966, at which time it was removed by judicial decree. This requires examination of the Torrens Act and its application to the facts appearing of record in this case.

The judicial system of registering titles to land was enacted in North Carolina by Chapter 90 of the 1913 Public Laws, now codified as Chapter 43 of the General Statutes. It is known generally as the Torrens Law. "The principle of the 'Torrens System' is conveyance by registration and certificate instead of by deed, and assimilates the transfer of land to the transfer of stocks in corporations." *Cape Lookout Company v. Gold,* 167 N.C. 63, 83 S.E. 3 (1914) ; Frederick B. McCall, The Torrens System—After Thirty-Five Years, 10 N.C.L. Rev. 329 (1932).

The Torrens Law authorizes any person in the peaceable possession of land in North Carolina who claims an estate of inheritance therein to "prosecute a special proceeding in rem against all the world in the superior court for the county in which such land is situate, to establish his title thereto, to determine all adverse claims and have the title registered." G.S. 43-6.

Such proceeding for the registration of title is commenced "by a petition to the court by the persons claiming, singly or collectively, to own or have the power of appointing or disposing of an estate in fee simple in any land, whether subject to liens or not." The petition must be signed and verified by each petitioner, must contain a full description of the land to be registered together with a plot of same by metes and bounds, must show when, how and from whom it was acquired, list all known liens, interests, equities and claims, adverse or otherwise, vested or contingent, and give full names and addresses, if known, of all persons who may be interested by marriage or otherwise, including adjoining owners and occupants. G.S. 43-8.

When such petition is filed the clerk is required to issue a summons directed to the sheriff of every county in which named interested persons reside, naming them as defendants. The summons is returnable as in other cases of special proceedings, "except that the return shall be at least sixty days from the date of summons." It must be served at least ten days before the return thereof and the return recorded in the same manner as in other special proceedings. G.S. 43-9.

The clerk is required, at the time of issuing the summons, to publish a notice of filing of the petition in some secular newspaper published in the county wherein the land is situate, once a week for eight issues of such paper. The notice shall be addressed "To whom it may concern" and shall set forth the title of the proceeding, the relief demanded, and state the return day of the summons. "The provisions of this section, in respect to the issuing and service of summons, and the publication of the notice, shall be mandatory and essential to the jurisdiction of the court to proceed in the cause: Provided, that the recital of the service of summons and publication in the decree or in the final judgment in the cause, and in the certificate issued to the petitioner as hereinafter provided, shall be conclusive evidence thereof." G.S. 43-10.

The petition is then set for hearing upon the pleadings and exhibits filed. If any person files an answer claiming an interest in the land described in the petition, the matter is referred to the "examiner of titles" who hears the cause on such parol or documentary evidence as may be offered, makes such independent examination of the title as may be necessary, and files with the clerk a report of his conclusions of law and fact, setting forth the state of the title, together with an abstract of title to the lands. G.S. 43-11(a), (b). Any party to the proceeding may file exceptions to said report, whereupon the clerk must transmit the record to the judge of superior court for his determination. If title is found to be in the petitioner, "the judge shall enter a decree to that effect, ascertaining all limitations, liens, etc., declaring the land entitled to registration accordingly, and the same, together with the record, shall be docketed by the clerk of the court as in other cases, and a copy of the decree certified to the register of deeds of the county for registration as hereinafter provided." G.S. 43-11(c).

Judgment by default is not permitted. The court must require an examination of the title in every instance except as to parties who, by proper pleadings, admit petitioner's claim. If no answer is filed, the clerk must refer the matter to the examiner of titles anyway. If title is found in the petitioner, then the clerk enters a decree to that effect, declares the land entitled to registration, and certifies it for registration after approval by the judge of the superior court. G.S. 43-11(d).

"Every decree rendered as hereinbefore provided shall bind the land and bar all persons and corporations claiming title thereto or interest therein; quiet the title thereto, and shall be forever binding and conclusive upon and against all persons and corporations, whether mentioned by name in the order of publication, or included under the general description, 'to whom it may concern'; and every such decree so rendered . . . shall be conclusive evidence that such person or corporation is the owner of the land therein described, and no other evidence shall be required in any court of this State of his or its right or title thereto." G.S. 43-12.

The county commissioners are required to furnish a book to the register of deeds, to be called "Registration of Titles," in which the register shall enroll, register and index (1) the decree of title mentioned in G.S. 43-11(c) and (d), (2) the copy of the

State v. Johnson

plot contained in the petition, (3) all subsequent transfers of title, and (4) all voluntary and involuntary transactions in any wise affecting the title to the land, authorized to be entered thereon. G.S. 43-13. Upon the registration of such decree, the register of deeds is directed to issue an "owner's certificate of title," the form of which is prescribed, bearing a number which is retained as long as the boundaries of the land remain unchanged. G.S. 43-15; G.S. 43-16.

Every registered owner of land brought under the Torrens System (with certain exceptions not pertinent here) holds the land free from any and all adverse claims, rights or encumbrances not noted on the certificate of title. G.S. 43-18. And "[n]o title to nor right or interest in registered land in derogation of that of the registered owner shall be acquired by prescription or adverse possession." G.S. 43-21.

The only way to transfer or affect the title to registered land is by registration of the writing, instrument or document by which such transfer is accomplished. Thus no voluntary or involuntary transaction affects the title to registered lands until registered, *and the registration of titles book is the sole and conclusive legal evidence of title.* G.S. 43-22.

No decree of registration and certificate of title issued pursuant thereto prior to March 10, 1919, may be adjudged invalid, revoked or set aside unless the action or proceeding in which their validity is attacked be commenced, or the defense alleging the invalidity be interposed, before March 10, 1920. G. S. 43-26.

Any person claiming any right, title or interest in registered land adverse to the registered owner, arising after the date of the original decree of registration, may file with the register of deeds of the county in which such decree was rendered or certificate of title thereon was issued, a verified written statement setting forth fully the right, title or interest claimed, how or from whom it was acquired, referring to the number, book and page of the certificate of title of the registered owner, together with a metes and bounds description of the land, and containing the adverse claimant's address and place of residence, and such statement must be noted and filed by the register of deeds. An action to enforce such claim may then be maintained provided it is commenced within six months of the filing of the statement. G.S. 43-27. If action is not timely commenced as re-

quired, the register of deeds must make a memorandum notation to that effect and cancel upon the registry the adverse claim so asserted. G.S. 43-28.

The sale and transfer, in whole or in part, of registered land is accomplished by the execution and acknowledgment of a paperwriting in the form set out in G.S. 43-31, which paperwriting has the full force and effect of a deed in fee simple. This paperwriting must be presented to the register of deeds together with the seller's certificate of title, and the transaction is then duly noted and registered in accordance with the provisions of the Torrens Law. G.S. 43-31; G.S. 43-32; G.S. 43-33; G.S. 43-37.

The other sections of the Act have no bearing upon the questions now before the Court. This summary of the pertinent parts of the Torrens Act shows that it "not only manifests a purpose on the part of the General Assembly to establish a title in the registered owner, impregnable against attack at the time of the decree, but also to protect him against all claims or demands not noted on the book for the registration of titles, and to make that book a complete record and the only conclusive evidence of the title." *Dillon v. Broeker,* 178 N.C. 65, 100 S.E. 191 (1919).

"The general purpose of the Torrens system is to secure by a decree of court, or other similar proceedings, a title impregnable against attack; to make a permanent and complete record of the exact status of the title with the certificate of registration showing at a glance all liens, encumbrances, and claims against the title; and to protect the registered owner against all claims or demands not noted on the book for the registration of titles. The basic principle of this system is the registration of the official and conclusive evidence of the title of land, instead of registering, as the old system requires, the wholly private and inconclusive evidences of such title." Frederick B. McCall, The Torrens System—After Thirty-Five Years, 10 N.C.L. Rev. 329 (1932) ; *Cape Lookout Co. v. Gold,* 167 N.C. 63, 83 S.E. 3 (1914) ; 8A Thompson on Real Property (Grimes Ed., 1963), § 4353.

Pertinent language from G.S. 43-10, the section specifying that eight weeks publication is necessary, reads as follows: "The provisions of this section, in respect to the issuing and service of summons and the publication of the notice, shall be mandatory and essential to the jurisdiction of the court to proceed in the cause: *Provided, that the recital of the service of summons and*

*publication in the decree or in the final judgment in the cause,
and in the certificate issued to the petitioner as hereinafter pro-
vided, shall be conclusive evidence thereof."* (Emphasis added.)
In the case before us the final decree of registration recites,
". . . it appearing that summons has been duly served upon all
parties in interest, and that publication of notice has been duly
made. . . ."

[7] The words of a proviso must be construed to effectuate
rather than to defeat the purpose of the statute. "A proviso
should be construed together with the enacting clause or body
of the act, with a view to giving effect to each and to carrying
out the intention of the legislature as manifested in the entire
act and acts in *pari materia."* 82 C.J.S., Statutes, § 381; *Lock-
wood v. McCaskill,* 261 N.C. 754, 136 S.E. 2d 67 (1964) ; 7 N. C.
Index 2d, *Statutes,* § 6.

When viewed in light of the stated purpose of the Torrens
Act, it is clear that the proviso in G.S. 43-10 is intended to cure
any jurisdictional defect with respect to issuance and service of
summons and the publication of notice so as to foreclose all
jurisdictional attacks on a Torrens title.

Our conclusion in that respect is fortified by Article 5 of
Chapter 43 of the General Statutes which prescribes the methods
for bringing forward and asserting adverse claims after reg-
istration of title. G.S. 43-26 provides in pertinent part:

"No decree of registration heretofore entered, and no
certificate of title heretofore issued pursuant thereto, shall
be adjudged invalid, revoked, or set aside, unless the action
or proceeding in which the validity of such decree of reg-
istration or certificate of title issued pursuant thereto is
attacked or called in question be commenced or the defense
alleging the invalidity thereof be interposed within twelve
months from March 10, 1919."

[6] We therefore hold that the recital in the final Torrens de-
cree of registration that "publication of notice has been duly
made" is *conclusive* evidence of the fact, and that any attack on
the 1916 decree is foreclosed by the limitation imposed in G.S.
43-26. *Northwest Holding Co. v. Evanson,* 265 Minn. 562, 122
N.W. 2d 596 (1963). The appellants cannot go behind the con-
clusive language of the decree.

Appellants contend that the boundary which separated Hugh MacRae and Company lands from Sherrill lands was irrevocably fixed by the exchange of deeds in 1943 and that the forces of natural accretion and erosion have no effect upon the present boundary. We now examine the validity of that contention.

[8]  " 'Accretion' denotes the act of depositing, by gradual process, of solid material in such a manner as to cause that to become dry land which was before covered with water." 5A Thompson on Real Property (Grimes Ed., 1957), § 2560; 6 Powell on Real Property, § 983 *et seq.* It is the opposite of *avulsion,* which is the "sudden and perceptible gain or loss of riparian land." 5A Thompson, *supra,* § 2561. Avulsion usually results from sudden, powerful, natural forces, such as a flood or a hurricane. Avulsion, unlike accretion, works no change in legal title. 5A Thompson, *supra,* § 2561.

[9]  Moreover, where accretions form on each side of a body of water and eventually meet, displacing the water which formed the boundary, a new property line is formed at the point of contact, and the body of water is no longer the boundary. *Hogue v. Bourgois,* 71 N.W. 2d 47, 54 A.L.R. 2d 633 (N.D. 1955). The rule is correctly stated in 4 Tiffany on Real Property (3d Ed., 1939), § 1228, as follows:

> "In the case of an island, the same rule applies as in the case of land bounded by water on one side only, that is, the boundaries are presumed to vary with any gradual change in the line between the land and the water or, as it is otherwise expressed, the owner of an island is entitled to land added thereto by accretion to the same extent as the owner of land on the bank or shore of the mainland. . . . In case accretions to the island and to the mainland eventually meet, the owner of each, it is said, owns the accretions to the line of contact, or, as we would prefer to express it, the boundary of an island, as that of the mainland, changes as its edge or shore line changes, and when there is no longer any island, owing to the growth of the accretions, he to whom the island belonged owns to where its edge or shore line was last visible."

"Where the stream forms the boundary between two tracts of land, and both shore lines receive accretions until they come together, the line of contact will then be the division line." 93

C.J.S., Waters, § 76. The following cases support this principle: *Buse v. Russell,* 86 Mo. 209 (1885) ; *Polack v. Steinke,* 100 Ark. 28, 139 S.W. 538 (1911) ; *Glassell v. Hansen,* 135 Cal. 547, 67 P. 964 (1902) ; *Waldner v. Blachnik,* 65 S.D. 449, 274 N.W. 837 (1937) ; *People v. Ward Redwood Co.,* 225 Cal. App. 2d 385, 37 Cal. Rptr. 397 (1964) ; *Durfee v. Keiffer,* 168 Neb. 272, 95 N.W. 2d 618 (1959). *See* Annotation, Applicability of rules of accretion and reliction so as to confer upon owner of island or bar in navigable stream title to additions, 54 A.L.R. 2d 643 (1957).

[10] That New Inlet completely closed by accretion in 1933 thus has controlling significance. When New Inlet was in existence, the land south of New Inlet was in effect an island, and the land to the north of New Inlet was mainland. Therefore, upon the closing of the inlet, the southern boundary line of the lands described in the Torrens decree and in Certificate of Title No. 8 was fixed by law on the ground where the accretion from the north finally connected with the accretion from the south to close the channel.

The avulsive reopening of a different inlet in 1944 at a point north of New Inlet's 1933 location worked no change in the location of that boundary line or in the legal title to the lands lying north and south of it. The newborn inlet was not the southern boundary of the MacRae lands. 5A Thompson, *supra,* § 2561. Rather, Hugh MacRae and Company became riparian owners on both sides of it. Then the natural forces of accretion and erosion began anew. The location of the inlet shifted slowly and imperceptibly southward by continuous wearing and washing away of sands on the south, and, at the same time, by slow and imperceptible alluvion and reliction resulting in sand accumulations on the north. After many years of this process, this inlet has moved south more than a mile and a half, passing through the old location of New Inlet on the way. When, in this fashion, it shifted southward into the old location of New Inlet, it did not, by reincarnation, become New Inlet and the boundary line. The boundary between the owners had already become fixed by law at an ascertainable line on dry land without reference to any waterline, and the southward movement of the avulsive inlet had no effect on the fixed boundary. This is true without regard to the exchange of deeds between Hugh MacRae and Company and the Sherrills on 9 December 1943. These deeds had no effect whatever on the southern boundary of the lands described in the Torrens decree and in Certificate of Title No. 8. G.S. 43-22.

We held in *Fishing Pier v. Town of Carolina Beach,* 277 N.C. 297, 177 S.E. 2d 513 (1970), that *where a body of water constitutes the boundary of a tract of land,* and where the gradual and imperceptible forces of erosion or accretion change the high water mark of that body of water, the boundary is accordingly changed. In the instant case, however, New Inlet no longer existed and no longer constituted the legal boundary. Of course, as the new and different 1944 inlet churned its way inexorably to the south, its location for a short time was on the very spot where the pre-1933 New Inlet had flowed years earlier. Even so, a "traveling inlet" does not uproot and supplant a boundary line as it passes over it unless such inlet in fact was the boundary when it started its journey.

Our position is supported by cases from other jurisdictions. In *Sweringen v. St. Louis,* 151 Mo. 348, 52 S.W. 346 (1899), it was said: "It is fundamental in the law of accretions that the lands to which they attach must be bounded by the river or stream to entitle its owner to such increase." The general principles to which we adhere in this case—that accretion and erosion do not change boundaries unless the body of water is a boundary line—finds support in the following authorities: *State v. Esselman,* 179 S.W. 2d 749 (Mo. App., 1944) ; *People v. Spencer,* 5 Mich. App. 1, 145 N.W. 2d 812 (1966) ; *Perry v. Sadler,* 76 Ark. 43, 88 S.W. 832 (1905) ; *Street Co. v. Cleveland,* 36 N.E. 2d 196 (Ohio App., 1941).

Moreover, textual treatments of the law of accretion and erosion prescribe the qualification that the watercourse must constitute the boundary of the property to entitle the riparian or littoral landowner to the benefits of accretion or to take from him the losses caused by erosion. See, for example, 5A Thompson, *supra,* § 2560, which reads: "Where a water-line is the boundary of a lot or tract of land, such line, no matter how it shifts, remains the boundary. . . ." *See also,* 11 C.J.S., Boundaries, § 34; 65 C.J.S., Navigable Waters, § 82; 12 Am. Jur. 2d, Boundaries, § 12, *et seq.;* 56 Am. Jur., Waters, § 477; 4 Tiffany on Real Property (3d Ed., 1939), § 1220. For the reasons above set out, we hold that the southern boundary of the Hugh MacRae and Company lands, and its successors in title, is at the point where the accretion from the north connected with the accretion from the south to close New Inlet in 1933.

[11]   We further hold that defendants Frank O. Sherrill and. wife do not have a right-of-way over the Johnson and Killings-

State v. Johnson

worth lands from the vicinity of Old Fort Fisher to the southern boundary of said lands. The Torrens Law provides that the registration of title book "shall be and constitute sole and conclusive legal evidence of title." G.S. 43-22. Title to the lands over which a right-of-way is claimed by the Sherrills was registered under the provisions of the Torrens Law from 1916 to 1966. The deed from Frank O. Sherrill and wife to Hugh MacRae and Company, Inc., in 1943 seeking to establish a boundary line and reserving a right-of-way across the lands of Hugh MacRae and Company, Inc., was not recorded in the registration of title book in New Hanover County. No notice of the existence thereof was made in said registration of title book or upon Certificate of Title No. 8 held by Hugh MacRae and Company, Inc. Hence said deed and purported reservation of right-of-way by the Sherrills had no effect whatever on the lands covered by the Torrens title. G.S. 43-18; G.S. 43-22.

[12] Furthermore, the Sherrills claim a right-of-way *by reservation* and not by grant. Yet they have never owned any of the lands over which they purportedly *reserved* a right-of-way. "An easement can be created only by a person who has title to or an estate in the servient tenement." 25 Am. Jur. 2d, Easements and Licenses, § 15; *see* C.J.S., Easements § 24 and cases cited. This alone is fatal to their right-of-way claim.

Frank O. Sherrill and wife allege in their pleadings and now contend that they own all of the land, beach land and marsh land lying south of a certain agreed boundary line established by an exchange of deeds between them and Hugh MacRae and Company, Inc., in 1943, said line being at the point where New Inlet was located in 1933 prior to closing.

[13] In all actions involving title to real property, title is conclusively presumed to be out of the State unless it is a party to the action. G.S. 1-36. The question of ownership here is essentially an action between individual litigants. The State, although a party for purposes of condemnation, claims title only by virtue of this condemnation and not otherwise. Hence, we indulge the presumption on this appeal that title is out of the State. Even so, there is no presumption in favor of one party or the other. Each litigant asserting ownership has the burden of showing title in himself. *Moore v. Miller,* 179 N.C. 396, 102 S.E. 627 (1920); *Powell v. Mills,* 237 N.C. 582, 75 S.E. 2d 759 (1953).

In support of their claim of ownership, the Sherrills offered in evidence a deed from D. C. Boyd and wife to Frank O. Sherrill dated 29 November 1938 and recorded 19 December 1938 in Book 66, page 515, Brunswick County Registry. (S-5) The description in that deed reads as follows:

"BEGINNING at the mouth of Lighthouse Creek, four beacon posts, and runs with Lighthouse Creek in a southeasterly direction about four miles to the Atlantic Ocean; thence with the Atlantic Ocean in a northeasterly direction to new inlet; thence with New Inlet to the Cape Fear River; thence with the Cape Fear River to the beginning, This being the balance of the property bought by T. F. Boyd about 20 years ago less that part which he has already sold to other parties."

The Sherrills also offered in evidence a deed from Hugh MacRae and Company, Inc., to Frank O. Sherrill dated 9 December 1943 and recorded 14 December 1943 in Book 76, page 480, Brunswick County Registry. (S-6) The description in this deed reads as follows:

"BEGINNING in the center of the middle cord of the Rock Dam across New Inlet, the point being marked with a cross cut in the Rock Dam it being the beginning corner of a tract of land conveyed by the party of the second part to the party of the first part by deed of even date, and running from said point.

"1. South 70 degrees 20 minutes East Seven Thousand one-hundred and fifty (7150) feet crossing what is known as Still Water Basin to low water mark on the shore of the Atlantic Ocean, the line being marked by an iron monument on the beach One-hundred and ten (110) feet from low water mark.

"2. Thence with low water mark of the Atlantic Ocean South 15 degrees West Forty-two Thousand (42,000) feet to the point of Cape Fear.

"3. Thence with the Southern shore of Bald Head Island with low water mark North 62 degrees West Twenty-Thousand (20,000) feet to a point beyond the Western shore of said Island in the ship channel of Cape Fear River.

"4. Thence up the various courses of the ship channel of the Cape Fear River in a Northeasterly direction to a point in said channel North 70 degrees and 20 minutes West Two-Thousand and three hundred (2300) feet from the point of beginning.

"5. Thence South 70 degrees and 20 minutes East Two-Thousand three hundred (2300) feet, to the beginning.

"Including the property generally known as the Bald Head Island Tract."

[14] The various methods of showing *prima facie* title to land in actions of ejectment and other actions involving the establishment of land titles are enumerated in *Mobley v. Griffin,* 104 N.C. 112, 10 S.E. 142 (1889). In such actions, he who asserts ownership must rely upon the strength of his own title. *Mobley v. Griffin, supra; Prevatt v. Harrelson,* 132 N.C. 250, 43 S.E. 800 (1903) ; *Moore v. Miller,* 179 N.C. 396, 102 S.E. 627 (1920). The burden of proof is upon the claimant. *Smith v. Benson,* 227 N.C. 56, 40 S.E. 2d 451 (1946).

[15] In the present action Frank O. Sherrill, without exhibiting any grant from the State, attempts to show open, notorious, continuous, adverse possession of a portion of the lands condemned, under color of title in himself and those under whom he claims for seven years or more before this action was brought—one of the methods by which title may be shown.

Taking the evidence offered by the Sherrills in the light most favorable to them, we are of the opinion, and so hold, that there is a total failure of proof as to the location of the land described in the two deeds offered by them. In *Smith v. Fite,* 92 N.C. 319 (1885), the first headnote summarizes the opinion in these words: "Where a party introduces a deed in evidence, which he intends to be used as color of title, he must prove that its boundaries cover the land in dispute, to give legal efficacy to his possession." In other words, the Sherrills must not only offer the deeds upon which they rely, they also "must by proof fit the description in the deed to the land it covers—in accordance with appropriate law relating to course and distance, and natural objects called for as the case may be." *Locklear v. Oxendine,* 233 N.C. 710, 65 S.E. 2d 673 (1951). Every litigant who affirmatively asserts his ownership of land "must show that the very deeds upon which he relies convey, or the descriptions therein

contained embrace within their bounds, the identical land in controversy. If one or more of his deeds convey less than the whole, he must show that the land conveyed thereby lies within the bounds, and forms a part, of the *locus in quo*. As to the identity of the land conveyed, a deed seldom, if ever, proves itself. Fitting the description contained in the deed to the land in controversy, or *vice versa*, must be effected by evidence *dehors* the record." *Skipper v. Yow,* 238 N.C. 659, 78 S.E. 2d 600 (1953). Accord, *Seawell v. Fishing Club,* 249 N.C. 402, 106 S.E. 2d 486 (1959); *Scott v. Lewis,* 246 N.C. 298, 98 S.E. 2d 294 (1957); *McDaris v. "T" Corporation,* 265 N.C. 298, 144 S.E. 2d 59 (1965).

The trial judge held that the Sherrills had failed to show title to any lands being condemned. We concur for that (1) the descriptions in the deeds offered were never fitted to the land in controversy, and (2) the evidence of adverse possession of *any portion* of the lands condemned was woefully inadequate. Adverse possession which will ripen into title must be for the prescribed period of time and be clear, definite, positive and notorious. It must be continuous, adverse, hostile, under known and visible lines and boundaries, and exclusive during the statutory period under a claim of title to the land occupied. *Bland v. Beasley,* 145 N.C. 168, 58 S.E. 993 (1907); *Snowden v. Bell,* 159 N.C. 497, 75 S.E. 721 (1912); *Locklear v. Savage,* 159 N.C. 236, 74 S.E. 347 (1912); *Barfield v. Hill,* 163 N.C. 262, 79 S.E. 677 (1913); *Vance v. Guy,* 223 N.C. 409, 27 S.E. 2d 117 (1943); *Mallett v. Huske,* 262 N.C. 177, 136 S.E. 2d 553 (1964). No such possession is shown. In fact, with respect to the lands lying north of Corncake Inlet and south of New Inlet as it was located in 1933 prior to closing, evidence of adverse possession by the Sherrills is practically nonexistent.

For the reasons stated in this opinion, we hold that (1) the State has complied with the statutory requirements necessary for the condemnation of the lands described in the amended complaint; (2) James E. Johnson, Jr., and Albert S. Killingsworth and wife, Elizabeth E. Killingsworth, were the owners in fee simple at the time of the taking (subject only to the monetary encumbrances set forth in Findings of Fact #2 and #3, Issue III) of all the lands condemned which lie north of a line on the ground where accretion from the north connected with accretion from the south to close the channel of New Inlet in 1933; and (3) Frank O. Sherrill and wife, Ruth J. Sherrill, have

proven no title to any of the lands condemned. The judgment below is modified accordingly.

Modified and affirmed.

Justice MOORE did not participate in the consideration or decision of this case.

Chief Justice BOBBITT concurring.

I concur in the decision and all of the Court's opinion except the portion thereof which holds that, by reason of the proviso in G.S. 43-10, "the recital of the service of summons and publication in the decree or in the final judgment" shall be "conclusive evidence thereof," *notwithstanding the court file discloses affirmatively that such service was not made.* Although I disagree as to this particular point, other grounds set forth in the Court's opinion amply support the decision.

Justice SHARP joins in this concurring opinion.