IN THE SUPREME COURT OF NORTH CAROLINA

2022-NCSC-5

No. 36A21

Filed 11 February 2022

IN THE MATTER OF: J.R.F.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from an order entered on 16 November 2020 by Judge J. H. Corpening, II in District Court, New Hanover County. This matter was calendared for argument in the Supreme Court on 22 December 2021 but determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

*Jane R. Thompson for petitioner-appellee New Hanover County Department of Social Services.*

*Sophie Goodman, for appellee Guardian ad Litem.*

*Christopher M. Watford for respondent-appellant father.*

MORGAN, Justice.

¶ 1      Respondent-father appeals from a trial court's order terminating his parental rights to J.R.F. (Ronnie[1]), a minor child born in February 2014. Respondent-father challenges the two grounds for termination found by the trial court, as well as the trial court's conclusion that termination of respondent-father's parental rights was in Ronnie's best interests. We conclude that at least one of the grounds found by the

---

[1] We use a pseudonym to protect the juvenile's identity and for ease of reading.

trial court for the termination of respondent-father's parental rights was supported by clear, cogent, and convincing evidence. We further conclude that the trial court did not abuse its discretion in deciding that Ronnie's best interests would be served by the termination of respondent-father's parental rights. Accordingly, we affirm the order of the trial court entered on 16 November 2020 which terminated the parental rights of respondent-father.

## I.    Factual Background and Procedural History

Petitioner New Hanover County Department of Social Services (DSS) began working with Ronnie's family in May 2018[2] by addressing his parents' issues with substance abuse, domestic violence, mental health, parenting, and housing stability. These issues continued without improvement despite DSS's involvement, prompting DSS to file a juvenile petition on 12 October 2018 which alleged that Ronnie was a neglected juvenile. The petition averred that respondent-father had violated multiple safety plans and displayed a deficit of basic parenting skills. The petition also alleged that respondent-father tested positive for cocaine and methamphetamines, continued to engage in mutual domestic violence incidents with Ronnie's mother, and suffered from untreated bipolar disorder. At the time that the petition was filed, Ronnie was living with his mother and half-siblings on a boat, which DSS described as "cluttered

---

[2] Although the family lives in Brunswick County, New Hanover County DSS provided services to them due to a conflict of interest on the part of Brunswick County DSS.

and unsafe for children." Ronnie had not received his recommended vaccinations since 2016, which prevented him from being placed in daycare or preschool. Instead, he was left unattended in the boatyard garage, where he had "access to multiple dangerous chemicals and tools" while his mother worked. The trial court awarded nonsecure custody to DSS on the same day that the agency filed the neglect petition.

¶ 3    The petition came on for hearing on 28 November 2018 during which the parents, represented by counsel, stipulated to the facts asserted by DSS in the agency's neglect petition. Based on these stipulations, the trial court adjudicated Ronnie as a neglected juvenile by way of an order entered on 27 December 2018. In the dispositional portion of its order, the trial court ordered respondent-father to: (1) comply with the terms of his Family Services Agreement; (2) complete a Comprehensive Clinical Assessment and comply with any recommendations; (3) execute a release with his service providers on behalf of DSS and Ronnie's guardian ad litem; (4) submit to random drug screens; (5) complete a domestic violence assessment and comply with any recommendations; (6) complete an anger management program; and (7) maintain stable housing and verifiable income.

¶ 4    The first permanency planning hearing occurred on 11 September 2019. In its resultant order from that hearing, the trial court made findings reflecting mixed progress on the part of respondent-father. While respondent-father participated in two Family Services Agreement meetings, participated in mental health and

parenting classes, and completed an intake assessment with the Domestic Violence Offender Program, he also admitted that he had slapped Ronnie's mother and poked her with a broom, ingested Suboxone and methamphetamines, missed three drug screens, and tested positive for buprenorphine and buprenorphine metabolite after another drug screen, and that he was unemployed and living with friends. The trial court set the primary permanent plan as reunification with a secondary plan of guardianship, and directed respondent-father to begin or continue the tasks ordered in its 27 December 2018 order.

¶ 5     The next permanency planning hearing occurred on 8 January 2020, after which the trial court changed the primary plan to adoption with a secondary plan of reunification in an order entered two weeks later. In that order, the trial court found that respondent-father was not making adequate progress on his case plan within a reasonable amount of time. Respondent-father had not verified his employment and was only periodically attending therapy that was recommended pursuant to a Comprehensive Clinical Assessment during which respondent-father displayed a lack of candor. Although respondent-father had obtained negative results on several drug screens since September of 2019, he had refused two drug screens in October and November 2019 and had admitted on 22 November 2019 to using illicit substances. Respondent-father had obtained independent housing, but the house was in need of repairs and was unsafe for children.

¶ 6    On 4 February 2020, DSS filed a petition to terminate respondent-father's parental rights to Ronnie, asserting two grounds for termination: (1) respondent-father had neglected Ronnie and there was a substantial likelihood of repetition of neglect if Ronnie was returned to respondent-father's custody pursuant to N.C.G.S. § 7B-1111(a)(1); and (2) respondent-father had willfully left Ronnie in a placement outside the home for more than twelve months without making reasonable progress to correct the conditions leading to the child's removal pursuant to N.C.G.S. § 7B-1111(a)(2).

¶ 7    The termination petition was heard over the course of five separate sessions during September and October 2020 where the trial court received testimony from social workers, treatment providers, character witnesses, and respondent-father himself. On 16 November 2020, the trial court entered an order terminating the parental rights of respondent-father. The trial court concluded that both grounds for termination alleged by DSS existed and that termination of respondent-father's parental rights was in Ronnie's best interests. Respondent-father appeals the trial court's order terminating his parental rights to this Court.[3] N.C.G.S. § 7B-1001(a1) (2019) (*repealed by* S.L. 2021-18, § 2 (eff. 1 July 2021)).

---

[3] The trial court's order also terminated the parental rights of Ronnie's mother and any potential unknown father. Only respondent-father appealed from that order.

## II.    Standard of Review

North Carolina trial courts employ a two-step process to adjudicate and dispose of actions filed to terminate the parental rights of a respondent-parent. First, once a petition has been filed to terminate the parental rights of a respondent-parent,

> a trial court conducts a hearing to adjudicate the existence or nonexistence of any grounds alleged in the petition as set forth under N.C.G.S. § 7B-1111. N.C.G.S. § 7B-1109(e) (2019). Then, following an adjudication that at least one ground exists to terminate the parental rights of a respondent-parent, the trial court will determine whether terminating the parental rights of the respondent-parent is in the child's best interests. N.C.G.S. § 7B-1110(a) [(2019)].

*In re A.M.*, 377 N.C. 220, 2021-NCSC-42, ¶ 13. In reviewing a trial court's actions at the adjudicatory stage, this Court must "determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law" that one or more grounds for termination exist. *In re E.H.P.*, 372 N.C. 388, 392 (2019). If clear, cogent, and convincing evidence supports a trial court's findings which support its determination as to the existence of a particular ground for termination of a respondent's parental rights, the resulting adjudication of the ground for termination will be affirmed. *Id.* Unchallenged findings are "deemed supported by competent evidence and are binding on appeal." *In re T.N.H.,* 372 N.C. 403, 407 (2019). The trial court's conclusions of law are reviewed de novo. *In re C.B.C.,* 373 N.C. 16, 19 (2019).

In our consideration of the dispositional stage, we review the trial court's assessment of a child's best interests for an abuse of discretion. The court's determination is subject to reversal only if it is "manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *In re T.L.H.*, 368 N.C. 101, 107 (2015) (quoting *State v. Hennis*, 323 N.C. 279, 285 (1988)).

### III.    Adjudication

Respondent-father first challenges the two grounds for termination which were found to exist by the trial court. We begin by examining whether the trial court erred in deciding that respondent-father's rights were subject to termination based on neglect by evaluating whether that conclusion was supported by findings of fact based on clear, cogent, and convincing evidence as reflected in the trial court's order.

The North Carolina General Statutes provide that a respondent-parent's rights to a child may be terminated if the respondent-parent neglects the child such that the child meets the statutory definition of a "neglected juvenile." N.C.G.S. § 7B-1111(a)(1) (2019). A neglected juvenile, in relevant part, is one "whose parent, guardian, custodian, or caretaker does not provide proper care, supervision, or discipline; . . . or who lives in an environment injurious to the juvenile's welfare." N.C.G.S. § 7B-101(15) (2019).

> Termination of parental rights based upon this statutory ground requires a showing of neglect at the time of the termination hearing or, if the child has been separated from the parent for a long period of time, there must be a

showing of a likelihood of future neglect by the parent. When determining whether such future neglect is likely, the district court must consider evidence of changed circumstances occurring between the period of past neglect and the time of the termination hearing.

*In re R.L.D.*, 375 N.C. 838, 841 (2020) (extraneity omitted). "[E]vidence of neglect by a parent prior to losing custody of a child — including an adjudication of such neglect — is admissible in subsequent proceedings to terminate parental rights," but "[t]he trial court must also consider any evidence of changed conditions in light of the evidence of prior neglect and the probability of a repetition of neglect." *In re Ballard,* 311 N.C. 708, 715 (1984). "The determinative factors must be the best interests of the child and the fitness of the parent to care for the child *at the time of the termination proceeding.*" *Id.*

¶ 12 In this case, respondent-father does not dispute the trial court's previous adjudication that Ronnie was a neglected juvenile, and instead focuses his challenge on the trial court's determination that "[r]epetition of neglect is highly likely given Respondent-[father's] lack of stability, unaddressed substance abuse issues and domestic violence issues." We note that respondent-father does not challenge any of the trial court's other findings of fact, thus rendering those unchallenged findings binding on appeal. *In re T.N.H.*, 372 N.C. at 407. We utilize these unchallenged findings to examine each of the three issues identified by the trial court as the basis for its finding that respondent-father's repetition of neglect was highly likely.

## A. Lack of Stability

As respondent-father correctly notes, the trial court found that he "has maintained employment throughout the Department's case," and therefore, he met his case plan's goal of obtaining stable employment. However, he was unsuccessful in obtaining stable housing suitable for habitation for Ronnie, which was also a component of respondent-father's case plan. The trial court's unchallenged findings of fact reflect that respondent-father was incarcerated from 26 June 2019 to 30 August 2019 because the term of probation that he was serving upon his conviction for methamphetamine possession was revoked. In the slightly over twelve months between respondent-father's release from his incarceration and the termination of parental rights hearing, respondent-father resided at Last Call Ministries before moving into a home with several safety defects which rendered the home unfit for Ronnie. Respondent-father's drug relapse caused him to move back to Last Call Ministries to live because he could no longer afford rent.

Respondent-father moved into a second residence beginning in August 2020. A DSS social worker visited this home on 27 August 2020 and discovered that it needed major repairs; respondent-father represented that the repairs would be finished in two weeks. When the social worker returned a month later, the home was still undergoing construction and was unsafe to serve as a residence for Ronnie. By the end of the termination of parental rights hearing, two bedrooms in the home were

completely repaired and furnished, but the kitchen and living room needed additional work.

¶ 15 As the trial court's binding findings demonstrate, respondent-father moved at least four times in the year preceding the termination hearing. Moreover, respondent-father had only occupied his newest residence for a few months by the time that the termination of parental rights hearing sessions had ended, and the residence still required additional repairs. These findings, based on testimonial and other trial and record evidence, support the trial court's determination that respondent-father lacked sufficient stability in his life, which in turn supports the trial court's conclusion that there was a substantial likelihood of repetition of neglect.

**B. Substance Abuse**

¶ 16 Respondent-father contends that his substance abuse issues were improperly characterized as "unaddressed" in light of the trial court's findings that he had negative urine and hair follicle drug screens on 18 August 2020, that he had completed an intake with treatment provider RHA[4] in August 2020, and that he had been meeting once a week with RHA's "Community Support Team."

¶ 17 While respondent-father's references to the transcript citations and the trial court's order correctly denote a degree of progress concerning his substance abuse

---

[4] The record does not show the full name of the treatment provider. References to the treatment provider are only by the letters "RHA".

issues as of a month before the termination of parental rights hearing began, respondent-father's argument conveniently ignores the trial court's abundant findings regarding his substance abuse history throughout the case. Respondent-father tested positive for controlled substances on at least six separate dates after Ronnie entered DSS custody, including a urine test that was positive for buprenorphine and a positive hair follicle test for amphetamines and methamphetamines on 25 June 2019; four positive drug screens for methamphetamines on 15 January, 27 January, 11 February, and 14 February 2020; and a hair follicle test that was positive for amphetamines and cocaine on 21 April 2020. In addition, respondent-father refused to take a hair follicle test on 22 November 2019 because he knew that it would be positive, and he refused to submit to additional hair follicle tests in October of 2019 and February of 2020.

¶ 18        In the early stages of this case, it was recommended that respondent-father attend intensive outpatient therapy; however, he failed to participate in such therapy until 24 February 2020. Upon doing so, respondent-father did not complete this therapy, attending only four of thirty-six required sessions in February and March 2020. The trial court found that, when respondent-father completed his intake with RHA in August 2020, he "underreported his substance abuse history" and was not interested in RHA's intensive outpatient therapy program because it was only offered virtually.

¶ 19    In light of these findings of fact which respondent-father has chosen to overlook in recalling the pertinent findings on this issue, this Court determines that the trial court did not err in characterizing respondent-father's substance abuse issues as "unaddressed." Respondent-father fell substantially short of completing an intensive outpatient therapy program as recommended and continued to have positive drug tests as the case progressed. While respondent-father had begun to make progress in the month preceding the start of the termination hearing in this case, such progress did not adequately establish that his ongoing and unresolved substance abuse issues would not contribute to Ronnie's future neglect if the child was returned to respondent-father's care. Instead, the trial court's findings establish a pattern of respondent-father's drug relapses and distinct lack of candor when engaging with substance abuse treatment providers, which further buttressed the trial court's determination that neglect would likely be repeated because of "unaddressed" substance abuse issues on the part of respondent-father.

## C. Domestic Violence

¶ 20    Respondent-father also asserts that he satisfactorily resolved his issues with domestic violence by severing his relationship with Ronnie's mother, which he testified was akin "to having a millstone removed from around his neck." Nonetheless, as with substance abuse, respondent-father did not begin to make progress on his domestic violence issues until shortly before the start of the

termination of parental rights hearing.

¶ 21    The trial court's unchallenged findings reflect that domestic violence occurred between respondent-father and Ronnie's mother throughout this case: On 3 December 2018, respondent-father broke the windows in the mother's vehicle and bruises were observed on the mother's legs; on 23 July 2019, law enforcement was called after the parents engaged in an altercation during which respondent-father slapped Ronnie's mother and poked her with a broom; respondent-father was charged with the offense of assault on a female on 29 June 2020 after he threw a flower pot at Ronnie's mother when she showered him with wasp spray;[5] and in July 2020, Ronnie's mother reported to law enforcement that respondent-father had "beat her up at work."

¶ 22    Respondent-father twice enrolled in the Domestic Violence Offender Program. During his first attempt to complete the program, respondent-father participated in seventeen of twenty-six group sessions, but he was removed from the program in March 2020 after his fourth missed session. Respondent-father began the program for a second time in July 2020, and his participation was described as "serious, humble, articulate, insightful and sincere." The trial court's findings establish that if respondent-father was able to continue this progress in the program, he would finish it in January 2021.

---

[5] The charges stemming from this incident were ultimately dismissed.

¶ 23   The trial court's findings suggest that respondent-father was showing improvement in addressing his domestic violence issues. However, this progress only began a maximum of two months before the termination hearing—a pattern similar to respondent-father's delayed response in beginning to promisingly address his substance abuse issues—and did not constitute a time period sufficient to compel the trial court to find that respondent-father had made adequate sustained progress so as to preclude the possibility that domestic violence would contribute to Ronnie's future neglect.

### D. Likelihood of Repetition of Neglect

¶ 24   The trial court's findings, taken together, reflect that although respondent-father made some progress with respect to stability, substance abuse, and domestic violence issues, any measurable improvement did not begin until July and August of 2020, merely a month or two before the start of the termination of parental rights hearing. Respondent-father did not begin to make meaningful progress toward the accomplishment of his case plan for almost two years while Ronnie was in DSS custody. By the time that the termination hearing began, respondent-father's progress had not been maintained for a sufficient period of time in order to show that he had ameliorated the conditions that led to Ronnie's initial neglect adjudication. Based on the evidence before it, the trial court did not err when it determined that "[r]epetition of neglect [was] highly likely" if Ronnie was returned to respondent-

father's care. *See In re H.A.J.,* 377 N.C. 43, 2021-NCSC-26, ¶23 (upholding the trial court's determination "that respondent-mother's last-minute progress was insufficient to outweigh her long-standing history of alcohol and substance abuse and domestic violence, as well as the impact these behaviors had on [her children]"). Accordingly, the trial court properly concluded that respondent-father's parental rights were subject to termination on the ground of neglect.

¶ 25        Because this Court has determined that one ground for termination of parental rights is supported here by findings based on clear, cogent, and convincing evidence, it is unnecessary to address respondent-father's arguments as to the remaining termination ground which was found to exist by the trial court under N.C.G.S. § 7B-1111(a)(2). *See In re A.R.A.,* 373 N.C. 190, 194 (2019) (noting that "a finding of only one ground is necessary to support a termination of parental rights.").

## IV.    Best Interests

¶ 26        Respondent-father argues that the trial court abused its discretion when it determined that termination of his parental rights was in Ronnie's best interests. Under N.C.G.S. § 7B-1110, a court making a best interests determination

> shall consider the following criteria and make written findings regarding the following that are relevant:
>
> (1) The age of the juvenile.
>
> (2) The likelihood of adoption of the juvenile.
>
> (3) Whether the termination of parental rights will aid

in the accomplishment of the permanent plan for the juvenile.

(4) The bond between the juvenile and the parent.

(5) The quality of the relationship between the juvenile and the proposed adoptive parent, guardian, custodian, or other permanent placement.

(6) Any relevant consideration.

N.C.G.S. § 7B-1110(a) (2019). The court's dispositional findings are binding on appeal if supported by any evidence in the record. *E.g.*, *In re K.N.K.*, 374 N.C. 50, 57 (2020).

In this case, the trial court made the following finding of fact detailing its consideration of the best interests factors:

> 140. That [Ronnie] is six years old. There is a strong likelihood that he will be adopted. He has two prospective adoptive placements. He has no known medical conditions or emotional disorders that would hinder adoption. He has had no mental health or behavioral hospitalizations, and his placement has never been disrupted due to his behaviors. [Ronnie's mom] and [respondent-father] have a bond with [Ronnie], however, it has diminished over the last two years. Respondent-Parents have only seen [Ronnie] once per week for two hours for the last two years. It is not a true quality parental relationship. [Ronnie] desperately needs permanence. [Ronnie]'s need for permanence outweighs the parental bond that exists. . . . Termination of parental rights will aid in the accomplishment of the permanent plan of adoption for the Juvenile. There are no other known barriers to adoption.

Respondent-father challenges two aspects of this finding: the trial court's description of respondent-father's bond with Ronnie and the likelihood that Ronnie will be

adopted.

## A. Respondent-father's Bond with Ronnie

The trial court found that respondent-father had a bond with Ronnie, but that it had diminished over the course of the two years that Ronnie was in DSS custody. Respondent-father asserts that there was no evidence to support the trial court's determination that the bond between respondent-father and Ronnie had diminished. Respondent-father notes that at disposition, the DSS social worker testified that Ronnie "has a very strong bond" and "a very close bond" with his parents.

While the social worker testified that the parental bond was "very strong" and very close," all of the other evidence during the hearing's best interests phase established a weaker connection between respondent-father and the juvenile. Ronnie's guardian ad litem testified that she merely observed a bond between Ronnie and respondent-father; she did not characterize the strength of the bond or represent that it was particularly strong. The DSS social worker also testified that Ronnie had recently told her that, if necessary, he was ready to "grow up in foster care, get married, have kids. . . . [A]nd he shared that foster care's kind of like having his own family." The trial court also made an unchallenged finding that Ronnie and respondent-father only had contact "once per week for two hours for the last two years." The record shows that these visits were sometimes contentious. At a visit in March 2020, Ronnie threw a toy across the room at respondent-father, tried to break

a watch that respondent-father had given him, and crawled under the couch and would not engage with respondent-father. The guardian ad litem testified that, at a visit conducted shortly before the termination hearing concluded, she witnessed Ronnie biting respondent-father. It was within the trial court's purview as the trier of fact to infer from the aforementioned competent evidence and the findings of fact, in tandem with its assessment of the entirety of the evidence, that Ronnie's bond with respondent-father had diminished over the two years that Ronnie was in DSS custody. *See In re D.L.W.*, 368 N.C. 835, 843, (2016) (As the trier of fact, the district court determines "the reasonable inferences to be drawn" from the evidence.), *limited by In re R.L.D.*, 375 N.C. at 841 n. 3.

¶ 30    We additionally observe that in the remainder of the trial court's findings, the court acknowledged both that there was an existing parent-child bond and that "[Ronnie]'s need for permanence outweighs the parental bond that exists." As this Court has previously explained, even a strong "bond between parent and child is just one of the factors to be considered under N.C.G.S. § 7B-1110(a), and the trial court is permitted to give greater weight to other factors." *In re Z.L.W.*, 372 N.C. 432, 437 (2019). The trial court, in its discretion, clearly believed that the statutory factor relating to the bond between the juvenile and the parent was outweighed in this case by other statutory factors delineated in N.C.G.S. § 7B-1110, and we discern no abuse of discretion in the trial court's determination.

## B. Ronnie's Likelihood of Adoption

Respondent-father contends that the trial court's finding that Ronnie has a strong likelihood of adoption is unsupported by competent evidence, because the juvenile's current foster care placement was unwilling to adopt Ronnie, the juvenile's first prospective adoptive placement had met Ronnie on only two occasions, and the juvenile's second prospective adoptive placement was only willing to consider adoption if the first placement did not remain intact.

None of the concerns which respondent-father identifies regarding Ronnie's prospective adoptive placements affect the viability of Ronnie's adoptability. As the trial court also found, Ronnie "has no known medical conditions or emotional disorders that would hinder adoption. He has had no mental health or behavioral hospitalizations and his placement has never been disrupted due to his behaviors," and "[t]here are no other known barriers to adoption." These additional findings portend that Ronnie has a high likelihood of adoption, even if he had no potential adoptive placement at the time of the termination proceedings. *See In re M.A.,* 374 N.C. 865, 876 (2020) (upholding the trial court's findings that the children's likelihood of adoption was very high, even though no prospective adoptive placement had been identified, based on other evidence such as testimony that "there were no barriers to the children's adoption"). The record indicates that two of Ronnie's placements have expressly indicated a willingness to consider adopting him. Combining this fact with

the trial court's findings regarding the lack of barriers to Ronnie's adoption, respondent-father's challenge to the trial court's finding addressing Ronnie's adoptability is unpersuasive.

## C. Best Interests Determination

¶ 33 Finally, respondent-father contends that the trial court abused its discretion in concluding that termination of respondent-father's parental rights was in Ronnie's best interests. Respondent-father's argument is premised on his observation that "it appears that the trial court made such a momentous decision based on a misunderstanding of Ronnie's true circumstances."

¶ 34 This final contention is without merit. The trial court's termination order includes findings of fact regarding each of the dispositional factors in N.C.G.S. § 7B-1110, and these findings were drawn from a reasonable interpretation of the evidence before the trial court. The dispositional details contained in Finding of Fact 140 are either unchallenged and thus binding on respondent-father, *In re T.N.H.*, 372 N.C. at 407, or are supported by competent evidence as previously explained. "And this is so notwithstanding evidence to the contrary." *State v. Johnson*, 278 N.C. 126, 138 (1971) (citations omitted). The trial court's conclusion that termination of respondent-father's parental rights was in Ronnie's best interests was the product of the trial court's application of the statutory factors identified in N.C.G.S. § 7B-1110, and respondent-father has failed to show that this conclusion is "manifestly unsupported

by reason or is so arbitrary that it could not have been the result of a reasoned decision." *In re T.L.H.*, 368 N.C. at 107 (quoting *State v. Hennis*, 323 N.C. 279, 285 (1988)).

## V.     Conclusion

The trial court's unchallenged findings of fact support its determination that respondent-father's parental rights were subject to termination based on the ground of neglect. Furthermore, the trial court did not abuse its discretion in concluding that, after considering the competent evidence in the record, termination of the parental rights of respondent-father was in Ronnie's best interests. We therefore affirm the 16 November 2020 order of the trial court terminating respondent-father's parental rights.

AFFIRMED.